## Houston Sharp v. The State.

### No. 4348.   Decided March 14, 1917.

Rehearing denied May 2, 1917.

**1.—Murder—Insufficiency of the Evidence—Confessions—Exculpatory Matter—Rule Stated.**

It is the settled law of Texas that, where the State puts in evidence a confession of the defendant, some of which is exculpatory, the State is bound by the confession unless it disproves the exculpatory matter. Following Menefee v. State, 67 Texas Crim. Rep., 201, 149 S. W. Rep., 138, and other cases.

**2.—Same—Insufficiency of Evidence—Want of Malice.**

Where, upon trial of murder, under the old statute, defendant was convicted of murder in the first degree and the death penalty assessed, upon a confession of the defendant containing exculpatory testimony which was not proved to be false, and when the defendant denied the whole transaction, basing his defense on an alibi, and the evidence outside of the confession was not sufficient to connect him with the killing etc., the conviction can not be sustained. Prendergast, Judge, dissenting.

**3.—Same—Confessions—Subscribing Witnesses—Rule Stated.**

It is only when the accused signs a confession by making his mark that peace officers are inhibited from becoming attesting witnesses. See opinion with reference to defendant's confession and the circumstances under which it is made.

**4.—Same—Exculpatory Testimony—Rule Stated.**

Where the State introduces exculpatory or mitigating statements of the accused, it is bound by them unless such statements can be shown to be false, and this is true whether the statements are exculpatory or mitigating. Following Pratt v. State, 50 Texas Crim. Rep., 227, and other cases.

**5.—Same—Rehearing—Standpoint of the Defendant.**

On the face of the motion for rehearing, the prosecution seems to lose sight of the fact that the case must be viewed from the standpoint of the defendant, and not that of the deceased, and matters contained in the motion which are not found in the record can not be considered on appeal.

Appeal from the Criminal District Court of Harris. Tried below before the Hon. C. W. Robinson.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*Leslie Spoonts* and *Harry C. Gerlach,* for appellant.—Cited cases in opinion.

*E. B. Hendricks,* Assistant Attorney General, *John H. Crooker, T. J. Harris,* and *E. T. Branch,* for the State.—On the question of confession: Morris v. State, 39 Texas Crim. Rep., 371; Nichols v. State, 32 id., 391; Sparks v. State, 34 id., 86; Paris v. State, 35 id., 82; Kugadt v. State, 38 id., 694.

On question of malice: Miller v. State, 32 Texas Crim. Rep., 319; Parsons v. State, 70 Texas Crim. Rep., 551, 157 S. W. Rep., 939; McCoy v. State, 25 Texas, 33; Farrar v. State, 42 id., 271; Martinez v.

State, 30 Texas Crim. App., 129; Cano v. State, 53 Texas Crim. Rep., 609; Butler v. State, 61 Texas Crim. Rep., 133; Hall v. State, 33 Texas Crim. Rep., 196; Spears v. State, 41 id., 537.

DAVIDSON, PRESIDING JUDGE.—Appellant was given the death penalty under a charge of murder for the killing of John Cain, a police officer of the City of Houston.

The State's case may be, substantially, stated as follows: Cain was a policeman, on duty in his allotted beat on the night of the homicide. About 3:30 or a few minutes later, in the early morning, a policeman was heard to exclaim: "Stop, I am an officer," and almost immediately a shot was fired. One or two policemen hearing the exclamation and shot went to the scene and found deceased, one of them testified, "shot through and through." He was shot in the front, the ball emerging from the back. His statement at the time was that he was shot by a negro whom he described as being yellow and wearing a mustache. The district attorney introduced a confession taken by himself from the defendant while a prisoner under burglary convictions in the penitentiary at Huntsville. It seems the district attorney went to Huntsville in company with two or three of the constabulary or policemen of Houston and talked with the defendant twice, and leaving him with the statement that if he wanted to talk with him later he could send for him. Some time later he did send for him, as testified by the district attorney, and made a statement to him in writing. He says the statement was voluntarily made after due caution. There was no one present at the time except he and the defendant. Shortly after this statement was made he and appellant went to another part of the penitentiary building, and the parties whom he had taken with him from Houston and three others witnessed the statement. Two of them were police officers, and under the statute would not be recognized as attesting witnesses. Neither would the policemen from Houston be so recognized. Mr. Teague stated he was warden of the penitentiary and witnessed it, and Mr. Binford, it seems, would hardly be classed in the category of peace officers. They testified they would not sign as attesting witnesses until it had been read over to the defendant, who had previously signed it only in the presence of the district attorney. It was then read in their presence to defendant and attested by them. It does not show when read in their presence it was explained to defendant, but they say it was read to him in their presence. In that statement appellant is made to use the following language, as directly pertinent to the issues:

"About August 1, 1911, I caught a freight train to Conroe and stayed up there a couple of days at a negro friend of mine named Collins. A preacher named Johnson saw me there during that time. I carried a grip from Houston with me and bought another one at a road camp where I stopped for a day. When I left camp I went up in the town

of Conroe and stayed around there until train time and then caught the train for Houston. I had the two grips with me and I had a pistol in my pocket. I saw the negro porter on the train whom I knew but I do not remember his name. When the train was into Houston in the Fifth ward, I got my grips, and when the train stopped for the LaPorte tracks just before they got to Buffalo bayou I got off and started back toward Nance Street. I was going along the track when I saw a police officer and I stopped in the shadow of a building until I thought he was gone, and then I started on again, and when I got a little farther I saw the officer coming toward the track along Nance Street, so that I would have just about met him. I was carrying both grips in my left hand as my right hand is crippled and was at that time, so I switched the two grips quickly to my right hand, and pulled my pistol with my left out of my left hip pocket and began running as fast as I could north right in the center of the tracks. The officer called to me twice to stop and I saw that he had his gun in his hand, so as I ran I turned and fired at him once. My gun was a double action gun but I cocked it before I fired. I saw him fall to the ground just after I fired, and I knew I had hit him as I heard him say something about being shot but I do not remember his exact words. I did not stop but kept running as hard as I could."

This is just an excerpt from the confession, and is quoted simply because it bears directly upon the tragedy at the time it occurred. Appellant took the stand and said with reference to the confession, that the first two times they asked him to make a confession or tell about it he denied knowing anything about it. He denied having anything to do with the killing, or his presence at the time and place, and the reason that he finally, on the third conversation, made the confession was because the district attorney had informed him of his official capacity, and that he had power to do with him pretty much as he pleased, and that if he would make the confession he would see that it would go easy with him, which he understood meant he was only to be sent to the penitentiary, and as he was already in the penitentiary for fifty-eight years on cumulative sentences for burglary, it would not amount to any serious matter. In other words, he testified that his confession was false, and that he made it under the promises of the district attorney excluding the idea that he would be hanged, which the district attorney and some of the officers said would occur if he did not make the confession. Without quoting at any length, this is the sum and substance of his testimony on that particular line.

This confession seems to have been thought necessary for the State, otherwise this trip to Huntsville by these officers and the means of securing the confession would not have been pursued. The police officer had not identified the defendant except by a description to the effect that he was a yellow negro with a mustache, and, as the writer recollects the record, this is not undertaken to be verified by any evidence other than the statement of the policemen, and all this occurred about

3:30 or 3:40 o'clock in the morning. The State introduced another witness who testified, substantially, that he saw a party get off the train at the crossing of the LaPorte road with a couple of grips in his·hand and start up the railway walking. One or more of the train officers, or crew testified that a negro got on at Conroe with a couple of grips, and got off at the LaPorte road crossing. So the substantially and concrete result of the State's testimony was intended to show that appellant had been to Montgomery County two or three days and had returned to Houston, where he lived and had married. The proof shows he lived in Houston Heights. He got off .the train at the point designated and started walking back up the track with the grips in his hand when the police officer hailed him, and he ran, pursued by the policeman with a pistol in his hand, and defendant after running a while turned and fired one shot and continued running. It is the settled law· of Texas that where the State puts in a confession, some of which is exculpatory, the State is bound by the confession, unless it disproves the exculpatory testimony. In Menefee v. State, 67 Texas Crim. Rep., 201, 148 S. W. Rep., 138, and Winkler v. State, 58 Texas Crim. Rep., 564, the rule is announced that where the State introduces a confession, it is bound by such confession until disproved. Again, it was announced that the whole of the confessions introduced by the State must be taken together, and the State is bound thereby, unless the confessions are shown to be untrue by the evidence, and the confession must be considered as evidence in connection with the other facts of the case. Pratt v. State, 59 Texas Crim. Rep., 635. Again it was held in Bailey v. State, 65 Texas Crim. Rep., 1, that where the State introduces a confession, it is bound by all the statements therein except such as are proven untrue, but only by such statements as introduced. It is further held that a confession should·be received with great caution, and a jury should hesitate to convict upon it in the absence of some corroboration, and in cases of murder, without proof of the corpus delicti, a confession of guilt, uncorroborated by other evidence, is not sufficient to warrant a conviction. This proposition was laid down in Jones v. State, 14 'Texas, 168, and has been followed since.

So it seems, taking the testimony as introduced by the State with reference to the statements of the deceased as to how the killing occurred, and the statements in the confession as claimed to be made by appellant, we have a traveler getting off the train at night, coming from a distant county, with his grips in hand, walking along the street railway, hailed by an officer, ordered to stop, about 3:30 or 3:40 o'clock in the morning, and a chasing of appellant by the officer, ordering him to stop with a pistol in hand, and a sudden turning by appellant and firing one shot, which proved fatal, and his flight continued. The State undertook to show as untrue the statements in the confession that deceased had his pistol in his hand through the testimony of one or two witnesses, that when they reached him shortly after the shooting, that while he had two pistols, one was in his hip pocket and the other

in the waistband of his pants. This does not necessarily indicate he did not have one of his pistols in his hand. He may have returned it after ·being shot, for he lived until late the following evening after being shot in the early morning. The State nowhere undertakes to disprove the fact but reiterates that appellant came in on the train and was going quietly along from where he alighted up the railway track with his grips in his hand. There is no reason shown by the State why the defendant should have been stopped by the officer. He had a right to travel on the train and a right to get off of it and go to his point of destination without let or hindrance provided he was not doing some illegal act, and this without interference with his free locomotion by anyone, officer or citizen.

We are met by the argument for the State that defendant had a pistol. The facts demonstrate that he did and used it with deadly effect, but he was a traveler, under the State's testimony, and, therefore, had a right to carry the pistol; but in addition, there is nothing to indicate that the officer was trying to arrest him for having a pistol, or even that the officer was aware of the fact that he had a pistol until after he ordered him to stop. He just ordered the defendant to stop. Defendant did not see proper to do so and ran. The officer chased him. There is something also said in the brief for the State to the effect that the officer had a right to arrest him because he was an escaped convict. This is hardly a contention, but there is a·reference to it. The record does not sustain that statement. He had been in the penitentiary nine years, but had gotten out in 1910. This homicide occurred in 1911. He had subsequently to 1910 married and lived in Houston. He followed various avocations, which was detailed in the testimony, in and around the City of Houston. Later, however, the defendant had been convicted of various burglaries subsequent to this transaction and had been sent to the penitnetiary for fifty-eight years, and had escaped in 1913, but was recaptured. Under the State's case as made, taking the confession and the statements and all the testimony presented under the record and under the authorities cited, this case does not present one which would justify or authorize the death penalty. The parties seemed not to have known each other or to have ever met. The officer did not know the negro, but seemed to think it was his duty to stop him for some unassigned reason. The defendant did not see proper to be held up or stopped. It was 3:30 or 3:40 o'clock in the morning. Defendant was walking along the railway track with his grips in hand, which he had the right to do, and was ordered to stop. This does not evidence that character of case which justifies the death penalty. The State put in exculpatory testimony, evidence which precluded the death penalty or murder in the first degree, and failed to show the statements false. The defendant denied the whole contention as being true, and introduced evidence to prove an alibi that he was not present and knew nothing of the transaction

until he read it the next day in the paper; that he did not shoot at or kill the deceased, and was not engaged in the tragedy. Outside of his confession the evidence was not sufficient to connect him with the killing, and in placing in evidence this confession with reference to the killing, or to show his presence at the time and place of the killing, they put in facts and circumstances which are in harmony with the statement of the officer as made to other officers immediately after the shooting as to being chased as he left the train

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

ON REHEARING.

May 2, 1917.

DAVIDSON, PRESIDING JUDGE.—The State's motion for rehearing criticises the opinion reversing the judgment. If the opinion is to be understood, as the State's motion indicates, as holding that peace officers can not become attesting witnesses to a confession, it does not correctly state the statute. It is only when the accused signs a confession by making his mark that such officers are inhibited from becoming subscribing witnesses to the confession. The matter discussed in that connection was, however, not that particular question, but it was the environments of the confession. In fact, that phase of the opinion was directed at the question of voluntariness of the confession and not whether officers were available as subscribing witnesses. Those officers did sign the confession, and an inspection of the opinion, we think, will show that the matter was mentioned as bearing on the situation of appellant at time of confession. The original opinion, we think, sufficiently shows this, but to remove any doubts as contended by the State, it is here announced that it is only when the accused signs a confession by making his mark that peace officers are inhibited from becoming attesting witnesses. The details of the testimony of the district attorney might be given in full in regard to the confession, and his reasons for going from Houston to Huntsville, accompanied by a police officer of Houston, to secure the confession but it is not necessary. The details of the circumstances attending his trip and subsequent matters after arriving at Huntsville in this connection would perhaps be of no particular benefit in this opinion. This was sufficiently mentioned in the original opinion. It is shown by the district attorney in his testimony that the signature of the defendant was obtained in connection with his third interview with him, and in a room in the penitentiary with no one present except himself and the accused, and that defendant signed it in the room only in the presence of the district attorney; that the defendant and district attorney then went with defendant to another room in the penitentiary and had these officers brought in, or at least they came, and were asked to sign as subscribing

witnesses. This they declined until the confession had been read to the defendant and he had signed it in their presence. This was done and they then became subscribing witnesses. Those matters were mentioned in the original opinion and are now referred to simply on the question between defendant and the State as to whether that confession was brought about by such inducement as claimed by him and as also affecting the matter of its being voluntary. One of these officers was sheriff of Burleson County, one a deputy sheriff of Grimes County, and one a police detective who accompanied the district attorney to Huntsville. The trial court recognized all this and gave the jury a charge as to whether it was voluntary or not, which fact was to be decided by them. It was an issue whether such confession was voluntary or not. This confession must have been offered or was evidently offered by the State to connect the defendant with the killing. The State thought that this confession was of value, else the efforts made to secure it would not have been put forth. While it may have served to connect the defendant with the homicide, it contained exculpatory statements which, if true, exonerated or at least mitigated any punishment that might be attached to the act of homicide if found guilty. The State was seeking a conviction for murder and obtained it with the death penalty. The statements made by the defendant exculpated him for such heinous offense. The facts do not show that it is a death penalty case. Where the State introduces exculpatory or mitigating statements of the accused it is bound by them unless such statements can be shown to be false, and this is true whether the statements are exculpatory or mitigating. Pratt v. State, 50 Texas Crim. Rep., 227; Combs v. State, 52 Texas Crim. Rep., 613. We deem it unnecessary to go into the details of the facts in this connection further than as given in the original opinion. These statements obtained in the confession by the State and introduced by the prosecution are exculpatory within the authorities cited.

In the presentation of the motion for rehearing both on the face of the motion and in the oral argument by the State the prosecution seemed to lose sight of the fact that the case must be viewed from the standpoint of the defendant. The State seemed to be under the impression, apparently at least as it now presents the case, that it should be viewed from the standpoint of the deceased. This is not correct. The defendant is held responsible for what he does and his purpose for doing it and the intent and motive moving him to do the act. There are some things stated in the motion for rehearing that are not found in the record, but it was contended in the argument by the State's counsel that all these things were known to the jury. As to this, this court would have no concern. We pass upon the record as it is presented to us. These matters were not in evidence, and are not sent up in the record. We can not consider such things.

Reviewing the case again in the light of the State's motion and its

·oral argument we see no reason to change our conclusion as to want of sufficient evidence to justify the verdict rendered in this case.

The motion for rehearing is overruled.

*Overruled.*

July 5, 1917.

PRENDERGAST, JUDGE (dissenting).—The testimony by wholly disinterested witnesses so overwhelmingly and conclusively demonstrates that appellant and no other foully murdered the deceased in cold blood, in the dead hours of the night, I can not give my consent to a reversal of this judgment of conviction. The majority opinions herein, I think, show a clear misconception of the testimony and of the law applicable thereto.

The sole question is, was the testimony sufficient to show that appellant murdered the deceased, John Cain, with express malice? The jury composed of twelve honest, fair and impartial men of different ages, walks and avocations in life, upon their oaths, say it was, and they so found. An impartial, eminent and wholly disinterested district judge, who presided at the trial, on his official oath, also so held. This judge and these jurors heard the witnesses when they testified, and saw their manner, and they could tell who testified the truth and who testified falsely. The judges of this court saw and heard none of this and can not tell who told the truth nor who swore falsely. Besides, our statutes expressly prescribe (art. 734, C. C. P.), "The *jury* are the *exclusive* judges of the *facts in every* criminal cause," and (art. 786), "The *jury,* in all cases, are the *exclusive* judges of the *facts* proved, and of the *weight to be given to the testimony."* It has always, heretofore, been held by this court, in ·obedience to these statutes, as held by Presiding Judge Davidson in Newton v. State, 58 Texas Crim. Rep., 319, *"The jury are the exclusive judges of the facts proved as well as the credibility of the witnesses and weight to be given the testimony."* This is such a well known maxim of our law it would be a useless consumption of time and space to collate the cases so holding. There is no case to the contrary.

Who was John Cain, the murdered man? The uncontroverted testimony shows he was a policeman in the City of Houston in the faithful discharge of his humble duties at the time he was shot down—foully murdered, in the silent watches of the night, at 3:30 a. m., on the night of August 4, 1911. "His primary duties were to arrest violators of the law, to detect and prevent crime, to enforce the law, to preserve the peace, and to protect life and property." I quote from an article in a recent issue of a leading journal.

Who was the man who thus shot down and foully murdered John Cain? The testimony herein, without a shadow of doubt, clearly and unequivocally demonstrates that the appellant, Houston Sharp, and no other was the guilty murderer.

Who was, and who is, Houston Sharp, the appellant? Let the record

answer. He swore: "I am sentenced to fifty-eight years in the penitentiary now on *sixteen* burglary cases." (S. F., p. 8.) . . . "I have been convicted in several counties on pleas of guilty to *twenty-eight* cases of burglary and theft and given a total of fifty-eight years in the penitentiary for same. I was indicted in several other cases for like offenses and they were dismissed on account of my pleading guilty as stated above. I had been in the pen for about nine years before this and got out in 1910 and that is when I moved to Houston. I was at the hospital farm in 1913 when I escaped from there in 1913. I was not there then for the fifty-eight years,—for the other part of the term I had not served before after I had escaped." (S. F., p. 29.) As I understand his testimony, he escaped from the penitentiary in 1910 while serving his sentence for the nine years *before* he was convicted in any of the burglary cases, and was an escaped convict when he killed John Cain, deceased, for he swore: "I was at the hospital farm (a penitentiary branch), in 1913 when I escaped from there in 1913. I was not then there for the fifty-eight years (but) *for the other part of the term* (of nine years). *I had not served before, after I had escaped."* He further swore that when attempted to be arrested by officers Haddicks and Duckworth, while an escaped convict, he resisted arrest, and swore: "I walks right out behind him with the gun in my hand and so when Mr. Haddicks turns around, Mr. Duckworth said, 'What are you going to do?' I said, 'Nothing, but I ain't going to jail,' and Mr. Haddicks turns around and starts out with his gun, I had the gun in my hand, I said, 'Stop, Mr. Haddicks, I don't want you to shoot me or me you.' I made him drop his gun or at least he handed me the gun and I taken it and pulled the magazine out and handed him his gun back and I went on off." (S. F., pp. 28-29.) He further swore that a little later when Mr. Jeter, another peace officer, tried to arrest him, while he was still an escaped convict, he shot at him in resisting arrest. (S. F., p. 29.) So that out of his own mouth he showed he was an escaped convict serving a nine-year sentence when he killed John Cain, and when he testified that he was a convict in the penitentiary serving out sentences of conviction in twenty-eight or sixteen burglary and theft cases, and had committed others, and that it was his settled policy to resist arrest whenever, and by whomsoever attempted. There can be no question but that he regarded every officer of the law his personal and mortal enemy, and acted on this on every occasion when he got the opportunity. A confirmed and persistent burglar will doubtless always shoot an officer when caught, or attempted to be arrested.

The original opinion herein seems to try to make it a point against the State that the district attorney, Judge Crooker, went from Houston to the Huntsville penitentiary to get a confession from appellant. The record shows this was not the case. He went there and took several disinterested witnesses with him for the purpose, and with the intention to see if appellant could be identified by them as the murderer of

John Cain. The confession was made by appellant after he had unquestionably been identified. Appellant by his own testimony showed that Judge Crooker, with several witnesses with him, arrived in Huntsville just as the convicts were to go to work; that he, appellant, and four other convicts together, were taken before these witnesses to see if they could identify him. I quote the words from his own mouth: "I was carried out there for the purpose of being identified, whether I was the man, two of these colored people brought up there, supposed to identify me, . . . so they came out to look at me, they never came out to look at the others. They knew I had a crippled hand because they had been informed I had a crippled hand, and the first thing they did was to look for the crippled hand; but it was not this woman Belle but another woman. I don't know why they did not have her there at that time; now after they identified me"— (S. F., pp. 21-22); then he says it was after this identification of him he made the confession.

Every witness who testified about the confession, as well as every other witness who testified against appellant, was a wholly disinterested witness. Not one of them was kin to deceased. Not one of them was shown to be in any way prejudicial against appellant or in favor of the State, and neither in any way is intimated to have had any motive whatever to testify other than the truth, the whole truth and nothing but the truth, and I have no doubt, and I can not see how any other who would read the record could have any doubt, but that each and every one of these witnesses swore the truth; and unquestionably, that appellant did not.

Now as to the confession. The district attorney, Judge Crooker, swore positively that appellant made to him the confession in evidence after he had given him, appellant, fully and accurately the warning required by the statute, and that he then and there signed it. He signed it twice; the first time in the presence of some of the witnesses, and when another was called to witness it, he required that appellant should again sign it in his presence before he would witness it. Appellant did so, and he then signed his name as a witness. Judge Crooker swore: "The confession was dictated by him (appellant) and what he stated put down by me, written by me in his presence, at his dictation and then read to him in the presence of the parties (witnesses) named." (S. F., p. 13.) He further swore: "There was no suggestion of force, threats, or persuasion used to make him make that statement; I know there was none used; it was freely and voluntarily made without a suggestion of coercion or anything else." (S. F., p. 14.) Again he swore: "It was read to him twice; in fact, in going over it with him it was read to him more than that; as I wrote it I would read him what I had written and then get him to go ahead and then later at the end I read all of it, and again in the presence of these gentlemen, it was read again; the defendant dictated it. I wrote it substantially as near as I could just exactly what he said." (S. F., p. 16.)

Appellant swore that said confession was not read over to him by Judge Crooker or anyone before he signed it. That he made it because Judge Crooker had agreed and promised him certain immunities. Also that it had been changed after he signed it and forged in several particulars. He also swore that he did not shoot the deceased, John Cain.

After appellant had so sworn Judge Crooker was again introduced and swore: "I heard the defendant's testimony about this confession; there has absolutely been no change in that statement whatever since he gave it; this is the identical statement that was read over to him and signed by him and witnessed by him; there was not a suggestion of any kind, or promise made to him." (S. F., p. 35.) In addition to this, I will give the testimony of the five persons who signed as witnesses to this confession.

D. E. Teague swore: "I am the warden of the State penitentiary, formerly was sheriff of Washington County; was that twenty-four years; am still connected with the penitentiary. I only know Sharp since I was at the penitentiary; I was at the penitentiary at time Judge Crooker took a statement from the defendant and I witnessed that statement; *it was read over to him in my presence; I heard it read to him;* that is the statement which you hand me; that is my signature on it; the statement was read over to him in my presence and I signed it." (S. F. p. 31.)

J. R. Jordan swore: "I am in charge of the criminal records at Huntsville; I know the defendant and Judge Crooker and was present at the time Judge Crooker came there and took a statement from the defendant in regard to the killing of the policeman, John Cain; I witnessed that statement; that is my signature; I was present when the statement was read over to him; Mr. Teague had witnessed it and he had already signed it and I asked that he sign it in my presence so that I could witness the signature after it was read to him; the statement you hand me is the one Mr. Crooker read there." (S. F., p. 33.) Mr. Jordan also swore that he had been county clerk of Cooke County for eight years before his employment at the penitentiary.

E. A. Ellis swore:  "I live in Burleson County; am sheriff of that county; this is my first term; have been a peace officer fourteen years; I know the defendant, was at the penitentiary when Judge Crooker was there and took a statement from him; I witnessed the signature of Houston Sharp; *I heard the statement read to the defendant and saw him sign it; he said it was true; this is the identical statement that you hand me.*" (S. F., p. 34.)

T. H. Lacey swore: "I am a deputy sheriff of Grimes County; have been a peace officer about eleven years; was sheriff of that county for some time. We knew the defendant there as Porter Wise; was present at Huntsville when Judge Crooker took a statement from him; *I heard the statement read in evidence here,* I witnessed the statement. *I heard the statement read to him and saw him sign it; he said that it was true.*" (S. F., p. 34.)

T. A. Binford swore: "I am a detective in the police department of the City of Houston, and have been for about eight years; know Houston Sharp; I was at Huntsville when he made that statement; I witnessed it; *I heard it read to him;* this is my signature; *this is the same statement that was read over to him; he said that it was a true statement."* (S. F., p. 35.)

Appellant himself swore: "I spent my early childhood in Jasper County and went to school there, and later at Prairie View, which is an institution of higher learning, stayed there three years. I taught school for a while." (S. F., p. 29.)

The trial judge in the charge told the jury that the statute provides that "the confession of a defendant may be used in evidence against him if it appear that the same was freely made without compulsion or persuasion." And further, "If you find from the evidence introduced on the trial of this case that this defendant was compelled or persuaded to make this confession by the criminal district attorney, you will not consider the said confession in arriving at your verdict."

From all this testimony can any human being for one moment doubt that appellant made and signed that confession literally, word for word, as it was plainly written? Surely not.

I now copy the whole confession, as follows: "I, Houston Sharp, being first duly warned by John H. Crooker, the person to whom this statement is made, first that I do not have to make any statement at all, and second that any statement I make may be used against me on the final trial of the case concerning which this statement is made, make the following voluntary statement: My name is Houston Sharp and I am forty years old. I went right to Houston and married and lived in the Heights and worked for the Consumers Oil Mill for some time. When I left the oil mill in the spring of 1911 I went in partners with Ed Lee, running a blacksmith shop on Clark Street until about June, 1911, when I quit there and went to hauling wood in the Heights for myself. About August 1, 1911, I caught a freight train to Conroe and stayed up there a couple of days at a negro friend of mine named Collins' house. A preacher named Johnson saw me there during that time. I carried a grip from Houston with me and bought another one at a road camp where I stopped for a day. When I left the camp I went up in the town of Conroe and stayed around there until train time and then caught the train for Houston. I had the two grips with me and I had a pistol in my pocket. I saw the negro porter on the train, whom I knew, but I do not remember his name When the train was into Houston in the Fifth ward, I got my grips and when the train stopped for the LaPorte tracks, just before they got to Buffalo bayou, I got off and started back toward Nance Street. I was going along the track when I saw a police officer and I stopped in the shadow of a building until I thought he was gone and then I started on again and when I got a little farther I saw the officer coming toward the track along Nance Street so that I would have just about met him. I

was carrying both grips in my left hand as my right hand is crippled and was at that time, so I switched the two grips quickly to my right hand and pulled my pistol with my left out of my left hip pocket and began running as fast as I could north right in the center of the tracks. The officer called to me twice to stop and I saw that he had his gun in his hand so as I ran I turned and fired at him once. My gun was a double action gun but I cocked it before I fired. I saw him fall to the ground just after I fired and I knew I had hit him as I heard him say something about being shot but I do not remember his exact words. I did not stop but kept running as hard as I could. I saw a negro man and negro woman coming from the same direction the officer had, that is along Nance Street, but I would not remember them. I remember there was an electric light there and suppose they could have seen me, as I was up on the center of the railroad and they were down on the ground. I dodged around there in that neighborhood and crossed the bayou over into Second ward, and then went to a woman's house named Black Belle. I had seen her before and knew where her place was. She is the same negro woman who came up to the Caldwell jail and looked at me. I stayed in a room there that night and paid for it. While I was there I laid my pistol on a table and it had not been changed since I shot the officer. I took the two grips the next morning and went to my home in the Heights. No one saw me at home with the grips or pistol except my wife and she has died since then, but I did not tell her anything about this. I continued to live in Houston Heights till about March, 1912, when I left and went to Louisiana. I first learned that I had killed the officer on the following evening from the newspaper. I never said anything about this matter to anyone until about November, 1915, when I was in the Grimes County jail and I met two negroes there, Ike Phelps and Cleveland Craft, one of whom I had known before, and I got to talking to them and told them about killing this officer.

| (Sd) | D. E. Teague. | (Sd) | Houston Sharp. |
|------|---------------|------|----------------|
|      | J. R. Jordan. | (Sd) | Houston Sharp." |
| .    | E. A. Ellis.  |      |                |
|      | T. H. Lacy.   |      |                |
|      | T. A. Binford." (S. F., pp. 16, 17, 18.) | | |

But outside of, and in addition to said confession, the State, without any sort of doubt, proved that appellant and no other murdered John Cain, deceased, at the time and place he was killed, as I will now show.

Ike Gailey, the porter on the train from Conroe, in Montgomery County, to Houston and beyond, testified that appellant got on that train at Conroe with a suitcase and hand grip and rode on that train from Conroe to the railroad crossing in Houston; that when the I. & G. N. train stopped and whistled for that crossing he had to get out, go to that crossing and flag the train so as to let it pass over; that while he was out discharging this duty appellant got off of that I. & G. N. train. (S. F., pp. 7-8.)

W. P. McKee, who on the night of August 3, 1911, was an employe or watchman at the Industrial Rice Mills on the track, right near the crossing of the I. & G. N., testified that the I. & G. N. train in stopping for that crossing, stopped right by the side of the mill of which he was the watchman; that on this particular night when the train stopped he looked out at it, could see it plainly, and he saw a colored man, who could have been no other than the appellant, get off of that train with a suitcase and hand grip. He described him in such a way as to unquestionably identify that person as the appellant. He swore that after he got off this train he went back north, up the I. & G. N. track, and after passing where he, the witness, was, in a very short time he heard a shot fired up there, and the shot was fired where officer John Cain was shot, about four blocks distant.

James Rabie, employed at the time by the International Press, right at the crossing of said railroad tracks, testified that he knew deceased, John Cain; that shortly before the arrival of said I. & G. N. train he saw John Cain ring into headquarters and make his report. He then talked with him there some minutes; that he then heard the I. & G. N. train arrive in Houston and just after it had passed on over said crossing, he swore: "After hearing the passenger train pass, I heard talking on the railroad track out there. I recognized Mr. Cain's voice. He says, 'I am an officer, stop.' The reply was: 'Stop hell!' And then gun fire. The man that fired the gun ran up the track north and Mr. Cain holloed 'Help.' I went to him, in less than two minutes. When I got to him, he was laying right flat on his back. He wanted me to notify the station and have Wright's ambulance called immediately. I asked him: 'John, are you shot? What is the matter?' He says, 'I am shot.' I says: 'Where at.' He opened his coat. There was a little red spot right there. Then I went and notified the station and called the ambulance and then I ran back and he was still complaining, holloaing and talking. Then I asked him who shot him. He said: 'A negro, yellow negro.'" (S. F., pp. 3-4.)

Norflette Hill, a city detective in Houston, and was a mounted policeman at the time, swore: that as soon as Mr. Rabie 'phoned that John Cain was shot he and his partner went right over there on horseback and found Mr. Cain where he had been shot. He said that when he got to him that he saw he was shot through and through in the breast near the center of his body; that at this time John Cain made a statement to him. On direct examination he swore: "He said a negro shot him. He described the negro. He said it was a yellow negro with a mustache carrying a telescope or suitcase and a little hand bag." (S. F., p. 2.) He further swore that the said shot killed John Cain and that he died the following evening about 2 or 3 o'clock. On cross-examination he swore: "I said Mr. Cain made a statement to me. I asked him who shot him and he told me that it was a yellow negro with a long mustache carrying a hand telescope or suitcase or good big satchel and a little hand bag. And he told me that he fol-

lowed him down the track and holloaed to him a time or two to stop, that he was an officer. He told me that he had holloaed to him several times to stop. I don't know whether he said two, three or four times; and when he got up pretty close in about eight feet of this man, the man was carrying the suitcase and the little grip . . . in his right hand, and when he got up within about eight feet of him, the negro said: 'Stop hell' and shot him. Just wheeled and shot him and he fell right there. He was carrying the suitcase and a satchel in his right hand. That he was a yellow negro with a long mustache and had the appearance of a preacher, when he first looked at him." (S. F., p. 3.) On redirect examination he testified: "I saw Mr. Cain's pistol there. He had on two. One of them was stuck in the waist of his pants and the other was in his hip pocket. They were on his person. Neither one of his pistols were discharged. No empty chambers in any of them." (S. F., p. 3.) .

Belle Jenkins ("Black Belle"), a negro woman who lived in Houston, swore that on the night or early morning in which John Cain was shot that appellant, whom she knew, came to her house and wanted a room; that when he came in he handed her his gun—pistol; that when he gave it to her, "It was right hot, one bullet was gone out of it; I smelled powder; it was hot, felt warm I mean; . . . I could smell the burned powder." (S. F., p. 8.) She further swore that appellant stayed at her house the remainder of the night; that next morning two officers came down to her house hunting for a man by the name of "Holliding" whom they were after to arrest; that appellant was there at the time; that these officers found Holliding and arrested him; while they were doing this appellant hurriedly left her house, jumped over the fence on the side and escaped. She also swore that she went to the Caldwell County jail to identify appellant as the person who was at her house on said occasion, and did so.

George Peyton, one of the policemen who went to said negro woman, Belle Jenkins', house on the morning of August 4, 1911, to arrest Holliding, swore: "I saw the defendant there at that time; he ran out and jumped over the back fence." (S. F., p. 21.)

Roy Smith and his wife, Jennie, each swore that about the 7th or 8th of July, 1913, appellant was at their home and had dinner with them that day, stayed there several hours, and each swore that he then told them "that he was in trouble at Houston, that he had killed a policeman there in 1911." (S. F., pp. 11-12.)

The State proved by another witness that John Cain, deceased, was the only policeman that was killed in Houston in 1911.

It is true appellant testified that he was at home with his wife on the night of August 3, 1911, when John Cain was killed. He fixed this particular date by the fact that he claimed that his wife that night gave birth to a girl baby. To back up his testimony as to this alibi he introduced a negro woman midwife, Phyllis Curtis, who testified that she recalled waiting on appellant's wife "on or about August 11th"

and that she waited on her when she gave birth to said child. On cross-examination she swore: "I can not remember what day of the month it was; the only way I would know is by the way I made my reports." (S. F., p. 19.)

On cross-examination of appellant himself of his claimed alibi he was confronted by the said written report of the negro woman midwife, and swore: "This Harris County birth register No. 1986 that you now show me, shows the baby was born July 24, 1911, and that the certificate was filed in the county clerk's office July 26th." (S. F., p. 30.)

The court in his charge plainly told the jury, correctly, what was an alibi and charged the jury: "Now, if the evidence raises in your minds a reasonable doubt as to the presence of the defendant at the place where the offense was committed at the time of the commission threof, you will find him 'not guilty.' " Of course, no honest jury in the face of the testimony shown by this record could for one moment have thought of acquitting him on his claimed false alibi. It was without any doubt proven to be false. He, and he alone, was the murderer of John Cain.

No question whatever was raised in the court below or in this court by appellant in any way that the confession of appellant raised any issue in his behalf which could in any way exonerate him for the foul murder of John Cain. That question is for the first and only time mentioned by the opinion reversing this judgment. Even if it could be claimed at that late date that such an issue was raised, without the slightest doubt the State disproved it overwhelmingly by disinterested testimony. There can be no doubt from the testimony that the deceased, John Cain, saw appellant pull his pistol before Cain ever told him he was an officer and to stop; repeating this. The statute (P. C., art. 479) expressly requires any peace officer to arrest any person without warrant whom he sees carrying a pistol and makes it an offense for any officer who shall fail or refuse to arrest such person, either on his own knowledge, or information from some credible person, to be punished by a fine not exceeding $500. Appellant in carrying his pistol was not a traveler, as has been held many times by this court down to this date. He was merely going from Conroe, the county seat of Montgomery County, to Houston, in Harris County, an adjoining county. Even if he could be held to have been a traveler, it was John Cain's duty to arrest him when he saw him with a pistol. There was no duty, either express or implied, on John Cain, before arresting him, to judicially or otherwise investigate to determine whether he was a traveler. That question would be investigated when he was taken before the proper officer for that purpose. No doubt appellant was returning from one of his many burglarious raids, with his suitcase filled with stolen goods and he did not intend to even be stopped on that account, much less arrested.

Comment on, or a résumé of this testimony is wholly unnecessary. Having carefully read it time and again, I am convinced beyond a

reasonable doubt, or any other doubt, of appellant's guilt of the malicious murder of John Cain. Twelve fair and impartial jurors, in obedience to the oath they had taken, and who heard all this testimony and saw the witnesses testify, found that he was thus guilty; and the trial judge also so held. They, and not the judges of this court, by our Constitution and statute law are made the exclusive judges of these matters. Their verdict and judgment should stand. I can not give my consent to turn this murderer loose from his most righteous conviction, after a perfectly fair and impartial trial.

I respectfully but earnestly protest and dissent.