THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. HAROLD PARKER, DEFENDANT-APPELLANT.

Decided June 28, 1960.

Mr. *Joseph A. Hayden* argued the cause for the defendant-appellant (*Mr. Joseph A. Hayden* and *Mr. Anthony E. Grasso,* attorneys).

Mr. *Brendan T. Byrne,* Essex County Prosecutor, argued the cause for the plaintiff-respondent (*Mr. Donald H. Mintz,* on the brief).

The opinion of the court was delivered by
PROCTOR, J.   The defendant Harold Parker was indicted by the Essex County Grand Jury for the murder of Preston Morrell.   He was tried and convicted by a jury of murder in the first degree, with a recommendation of life imprisonment.   He appeals here as of right, and seeks reversal of his conviction on the grounds that the trial court erred in denying his motion for a judgment of acquittal at the end of the State's case, and that the trial court erred in admitting certain improper evidence and in giving the jury certain improper instructions.   He also charges that, in the aggregate, the court's errors deprived him of a fair trial.

The defendant admitted that he shot Preston Morrell in the morning of Saturday, July 12, 1958.   He maintained, however, that the killing was in self-defense and therefore justified.   At the trial, testimony as to the circumstances of

the shooting was given by seven witnesses for the State. The defendant testified in his own behalf. From the State's witnesses, the following picture appears.

At about 7:00 or 7:30 in the evening of July 11, the day before the shooting, Preston Morrell arrived at the apartment of Robert Liggon, a friend of his who also knew the defendant, at 608 Hunterdon Street in Newark. Morrell and Liggon then went to Morrell's house, had a few drinks of gin, and left at about 8:30 P. M. They then visited two bars, and left the latter at closing time, about 2:00 A. M. They met Angus Ellerbee, and then all three went to the apartment of Rosa Greene on Seymour Avenue in Newark.

The defendant also arrived at Rosa Greene's apartment at some time near when Morrell and Liggon appeared. It is unclear who was there first. In any event, the group at Rosa Greene's apartment after everyone arrived included the defendant, Morrell, Robert Liggon, Angus Ellerbee, a man called "Big Jack," Rosa Greene, her brother Brownie, and her sister Wilsie, a school teacher from South Carolina who was stopping at Rosa's apartment on her way to Boston.

Soon, Rosa Greene, Liggon, "Big Jack" and the defendant went into the kitchen of the apartment to play cards. Brownie went to bed; Ellerbee went to sleep on a couch in the living room, and Wilsie Greene and Morrell stayed in the living room, reading and talking. Morrell appeared to Miss Greene to be very "gentlemanlike."

At about 5:00 A. M., the defendant, having lost most of his money at cards, left the game and went into the living room. There, he and Wilsie Greene had a conversation. The defendant became argumentative, bragged about "his Cadillacs and diamonds," and began "low-grading the teaching profession." Miss Greene tried to avoid the conversation. The next thing she heard was the defendant calling Morrell a "nigger." A scuffle started, and Rosa Greene and Robert Liggon appeared from the kitchen and separated Morrell and the defendant. Rosa Greene testified she took the defendant into the hallway, and then allowed him to

return to the apartment on his assurance that there would be no more trouble. Later, another scuffle started. There was testimony that by this time both the defendant and Morrell acted intoxicated. There was also testimony that during this second scuffle, Morrell had something shiny in his hand, and that after the scuffle was over, the defendant was seen examining his stomach. Two Newark City detectives and a physician testified that shortly after the shooting, the defendant exhibited to them a few fresh small scratches on his body. There was also testimony that after the second scuffle Morrell said he had drawn blood from the defendant.

The defendant left Rosa Greene's apartment after the second scuffle. He was next seen by Elijah Powell at 604 Hunterdon Street at about 7:30 A. M. He was carrying a shotgun. Powell testified that he asked the defendant what he was going to do with the gun, and that the defendant replied, "Somebody is trying to cut me." Powell then advised the defendant to go home, and the defendant said, "Yes, Unk," or "O. K. Unk." Powell then said, "anybody who was carrying a gun around like that is looking to hurt somebody." The defendant replied "I don't want to hurt anyone, Unk," and then left. Powell went upstairs in his house, and later saw the defendant sitting in a car parked between 604 and 608 Hunterdon Street. Powell consulted his wife and then started to make a telephone call to his nephew "to come and pick [the defendant] up." Before Powell was able to complete the call, however, he heard a gun fire. His wife said "He must have shot him," and Powell looked out of the window and saw Morrell lying on the ground and the defendant near him.

In the meanwhile, the defendant had gone to the third floor of 608 Hunterdon Street, to the apartment shared by Robert Liggon and Lewis Brown. Only the latter was home. When Brown opened the apartment door to the defendant, he saw the shotgun lying in a corner just outside the door. The defendant asked if anyone else was home. Then, according to Brown's testimony, the defendant "* * * said

he had a little difficulty with somebody. * * * And if he found them he was going to hurt them." Brown replied "Look, I would go home." Without answering, the defendant then left, and Brown tried to return to sleep, but soon heard a shot and then police sirens, and so went downstairs to see what had happened.

Howard Brown also testified he saw the defendant before the shooting. He drove his car into the driveway between 604 and 608 Hunterdon Street, and saw the defendant talking with Elijah Powell. He did not speak with the defendant, and went immediately into 608 in order to collect rent from a first floor tenant. When he came out, some ten minutes later, he got into his car and started to back out onto the street. He did not see the defendant at this time. He heard Robert Liggon call from a car across the street, and so stopped and got out of his car and walked toward Liggon to speak to him. He was talking to Liggon and to Ellerbee and Morrell, who were also in the front seat of the car, when he discovered the defendant standing behind him, holding a shotgun. Liggon "jumped out of the car and told him to put the gun down, and started pushing him back." Morrell then jumped out of the car. As Brown left the scene, he saw the defendant "being pushed back or backing back." Liggon was in front of the defendant, and Morrell was following, with something shiny in his hand. Brown went back to his own car, and heard a shot. He saw Morrell lying in the street, and then left for work.

Robert Liggon testified that he, Morrell and Ellerbee left the Greene apartment at 7:30 A. M., about forty-five minutes after the defendant. Liggon left the apartment first in order to find out whether Parker was still around. He wanted to make sure "that there will be no more disturbments * * * between Morrell and Parker." They drove to Hunterdon Street in Ellerbee's car and when they reached 608, Ellerbee stopped his car on the opposite side of the street, when someone called to Liggon. He saw Howard Brown standing by the driveway at 608 and called to him.

Brown came across the street and he and Liggon stood at the side of the car discussing some work that Liggon wanted Brown to share with him. Next Liggon saw the defendant walking across the street toward him carrying a shotgun. At this point Liggon's testimony becomes unclear and much of it contradicts statements he had earlier given to the police, and the State was permitted to neutralize parts of it. The essential facts, however, can be gathered from what remains of Liggon's testimony. When he saw the defendant approaching the car, he told him "to go on and don't start any trouble and don't let there be no trouble." Morrell got out of the car and advanced toward the defendant. Liggon stood between them and tried to keep them apart. The defendant backed up about twenty to thirty feet, with Liggon in front of him and Morrell following with his hand in his pocket; Liggon kept the men apart with his outstretched arms. After a few minutes, Liggon gave up trying to keep peace and walked away past the defendant. He then heard a shot and turned around and saw Morrell lying on the ground.

A police officer, who arrived soon after the shooting, testified that he saw Morrell lying on the ground with a hole in his right shoulder and a small pair of scissors held loosely in his hand.

There was medical testimony that the cause of Morrell's death was a shotgun wound of the right chest, two and a half inches in diameter, which penetrated the right lung, with internal hemorrhaging into the right chest cavity. A ballistics expert testified that such a wound would be inflicted by the shotgun used by the defendant from a distance of seven to ten feet.

As part of the State's case, an unsigned statement made by the defendant was admitted into evidence by consent of counsel. In the statement the defendant related that, the night before the shooting, he left his home at 9:30 P. M., bought a half pint of gin, and visited three bars where he had several drinks. He then went to Rosa Greene's apart-

ment. The statement then narrates the events that occurred. In pertinent part it reads:

"We were playing stud poker (at Rosa Greene's apartment) until about daylight Saturday morning and I decided to stop playing as I was not winning any money and I got up from the table and I went into the front room where Rosa's sister, Morrell and Elebe were * * *.

When I came into the living room all three of us were talking, the conversation was something about school as I already knew Rose's sister was a school teacher and the conversation drifted to the school situation in the south and somehow or another I said damn and Morrell got offended and he jumped up and stood over me as if he was going to attack me and I told him I was sorry, he kept on arguing telling me I had no respect for ladies. He went back and sat down but the argument kept going and then he came after me again and that is when we got into a tussle and he nicked me in my stomach and under my left arm with something sharp he had in his hand I did not see what he nicked me with. I do not know but I held him down until I called for help from Bob and all of them came into the front room and I told Bob that this guy had cut me and Bob parted us.

Rosa and Bob told me to go into the kitchen and I went into the kitchen and I stayed in there until they got through playing cards, Bob told me that the guy's name was Morrell and he would cut my throat. After the game was all over, all of us had a beer and I walked to the front room going home and as I was going out Morrell jumped me again but I ran out of the building and he was behind me and I ran to the corner of Runyon Street and down Bergen Street, and I got a bus on Clinton Avenue, and I went to my home at 46 Murray Street.

When I got home I was angry and I went to my bedroom my wife was asleep and I got my shotgun from behind the bed, the gun was not loaded but I got five shells that were in the closet on the shelf, I put the shells in my pocket and I went downstairs with the gun wrapped in a sheet and * * * I went out into the street and caught a cab * * * and I told him to take me to Seymour Avenue near Runyon Street and as we rode along I changed my mind and I decided to go to Bob's house to find out who this guy was that tried to cut me.

I told the taxi driver to * * * let me off at 608 Hunterdon Street * * * and I got off right in front Bob's door, I saw Mr. Powell who lives at either 606 or 604 sitting on his stoop.

When I got out of the taxi I still had the shotgun in the sheet and the five shells in my pocket, I spoke to Mr. Powell and I walked upstairs into 608 to the third floor, I knocked on the door and Louis Brown came to the door and I asked him if Bob was home and Louis said no, Louis asked me what I was doing with

the shotgun and I told him 'man a cat mistreated me on Runyon Street' and that I had started to go and get him but it was not worth it and Brown told me that was right it was not worth it and I went downstairs and I put the gun in the first floor hall.

After I put the gun in the first floor hall, I went out of the building and I walked over to where Mr. Powell was seated and I asked him if he had a telephone and he asked me why and I told him I wanted to call my cousin.

While I was talking to Mr. Powell my wife's cousin Howard Brown drove into his driveway, I thanked Mr. Powell and I walked over to Howard and I told him that I had this gun in the hall and I wanted him to take me home he told me okay and I went into the hall and I got the gun and put it in his car and he walked away I don't know where he went or was going because at that time Elebe drove up in his car  *  *  *  and Bob Liggens, Morrell were seated in the front seat while Elebe, Bob was seated next to the door and Morrell was between Bob and Elebe.

When I saw Bob I started for the car I did not know who the two other fellows were at that time my cousin also started for the car at about the same time because the car was across the street on the opposite side, I hollered hey Bob and I started for the car and as I recognized Morrell I knew he had ran me before I went back to Howard's car and I got the shotgun and that is when I loaded the gun. After I loaded the gun I walked across the street and went around to the far side of the car and Bob was out on the sidewalk and Morrell was still in the car at the edge of the seat and Howard was on Elebe's side and as I walked around the car Morrell saw the gun and Bob said 'Man are you crazy' I told him no that I did not want to hurt anyone.

When Morrell seen me with the gun he tried to break out of the car and Bob held him in the car and I backed away and then Bob ran up to me that left Morrell free and then Morrell started for me and Bob had hold of the barrel of the shotgun and I told Bob to turn me loose here he comes, at that time Morrell had his hands in his pocket and Bob backed away and I backed up and I was pleading with Morrell to go away and he still was advancing upon me and as I backed away I nearly tripped and Morrell was so close to me that I had to shoot him, I did not see the knife, but he had his hands in his pocket and he had stuck me twice before and I was afraid and excited and the gun just went off I just closed my eyes and shot as he lunged for me."

At the conclusion of the State's case, a motion was made on behalf of the defendant for acquittal, which was denied.

The defendant then testified in his own behalf. His testimony generally coincided with the statement he gave the police, except that it portrayed Morrell more emphatically

as the aggressor, and himself more clearly as the victim of Morrell's attacks. His testimony also was to the effect that when he left his home with the shotgun, his intent was to shoot Morrell, but by the time he actually encountered him, he had long since given up the idea and his only thought was to return home.

After the defendant rested his case, he again moved for a judgment of acquittal. The trial court denied the motion and submitted the case to the jury. As mentioned above, the jury returned a verdict of guilty of murder in the first degree, with a recommendation of life imprisonment.

On this appeal the defendant first contends that the trial court committed plain error in charging the jury as to their consideration of the statement of the defendant quoted above. The court charged:

"Now, as to the effect of the unsigned statement made by the defendant to Detective Norris: The defendant admits he gave that statement voluntarily, and it was admitted in evidence by the Court with the consent of the defendant. Under the law, the credibility and the weight to be given to the statement, if any, like all other evidence, after it is admitted, is for the jury alone. It is, therefore, within your province and for you to determine what weight, if any, is to be given to this statement, and as to this you are the sole judges.

There has been some discussion as to the extent to which the statement implicates the defendant in this alleged crime, and so that there may be no question about that thought, I want to explain this as being the law: That in offering the statement of the defendant the State is not bound by, nor is the jury bound to accept, all of the statements as being true. The admissions therein made, under the principles that I have explained, may be used against him, but the State is not bound to adopt as true that part of the statement which exculpates him or is self-serving."

The defendant contends that the court's instruction left the jury with the erroneous impression that they could ignore the exculpatory portions of the statement, and could regard the remainder of the State's case as a *prima facie* case of murder. The defendant argues that the jury should have been charged that since the exculpatory portions of the statement tended to show that the killing was done in

self-defense, the State would not make out a case of intentional killing unless it came forward with evidence to disprove those portions of the statement.

In support of his position the defendant cites *People v. Miller,* 247 *App. Div.* 489, 286 *N. Y. S.* 702 (*App. Div.* 1936); *People v. Jordan,* 4 *Ill.* 2d 155, 122 *N. E.* 2d 209 (*Sup. Ct.* 1954); *Sharp v. State,* 81 *Tex. Cr. R.* 256, 197 *S. W.* 207 (*Ct. Crim. App.* 1917); *Yarbrough v. State,* 125 *Tex. Cr. R.* 304, 67 *S. W.* 2d 612 (*Ct. Crim. App.* 1933), for the proposition that when the State has introduced the confession of a defendant containing exculpatory statements, it is ordinarily incumbent upon the trial court to instruct the jury that the exculpatory portions are to be regarded as true unless they are disputed by other evidence in the case, or are so improbable as to be unworthy of belief.

We express no opinion whether a reasonably credible exculpatory statement of a defendant, standing uncontradicted in the State's case, must be accepted by the jury. Many courts and commentators have concluded that the jury should be at liberty to believe one portion of a defendant's confession and disbelieve another, as they are all evidence. These authorities reason that no testimony need be believed, but rather the jury may always credit as much or as little as they find reliable. *State v. Williams,* 142 *Wash.* 673, 253 *P.* 1074 (*Sup. Ct.* 1927); 7 *Wigmore, Evidence,* § 2100 (*3d ed.* 1940); *Greenleaf, Evidence,* § 201 (16*th ed.* 1899). See also *People v. Garcia,* 2 *Cal.* 2d 673, 42 *P.* 2d 1013 (*Sup. Ct.* 1935); *cf. State v. Coffey,* 228 *N. C.* 119, 44 *S. E.* 2d 886 (*Sup. Ct.* 1947). This question need not be determined because in the present case the State produced evidence contradicting the exculpatory portions of the defendant's statement. The testimony of Lewis Brown is in direct and crucial contradiction. In his statement the defendant said that when he went to Lewis Brown's room on the third floor of 608 Hunterdon Street, Brown asked him what he was doing with a shotgun. The defendant said that he replied: " 'Man a cat mistreated me on Runyon Street' and

that I had started to go and get him but it was not worth it."
One could infer from this statement that the defendant had
decided not to shoot Morrell. Lewis Brown's testimony was
that the last thing the defendant said when he left the
room was that: "If he found him [Morrell] he is going
to hurt him." Brown's version of the conversation indicates
that Parker had not abandoned his intent to shoot Morrell.
Elsewhere in his statement, the defendant said that after
leaving Lewis Brown's room he saw Howard Brown drive
his car into the driveway between 604 and 608 Hunterdon
Street, and that he told Brown he had a gun in the hall
and "I wanted him to take me home. He told me okay
and I went into the hall and got the gun and put it in
his car and he walked away  *  *  *." Here again one
could infer that the defendant had changed his mind about
shooting Morrell. Howard Brown's testimony, on the other
hand, was clear that the only time he saw the defendant
before the latter approached the Ellerbee car was when the
defendant was talking with Elijah Powell in front of 604
Hunterdon Street, as Brown drove his car into the driveway.
He testified that he never had a conversation with the
defendant on the morning of the shooting.

In another part of his statement the defendant related
what happened just before he left Rosa Greene's apartment
in the early morning of the day of the shooting: "After
the game was all over, all of us had a beer and I walked
to the front room going home and as I was going out
Morrell jumped me again but I ran out of the building and
he was behind me and I ran to the corner  *  *  *  and
I went to my home  *  *  *."

Robert Liggon's version differs considerably. He testified
that after helping to separate the defendant and Morrell,
after the second scuffle, he "told Parker to go ahead on
home and forget—don't get into any trouble and to forget
the whole thing.  *  *  *  He said, 'O. K. I'm going home,'
and walked on out the door."

Moreover, in its version of the end of the first scuffle, Parker's statement is contradicted. It relates: "Rosa and Bob told me to go into the kitchen and I went into the kitchen and I stayed in there until they got through playing cards. Bob told me that the guy's name was Morrell and that he would cut my throat." However, Rosa Greene testified that she and Liggon separated Morrell and the defendant, and that she took the defendant into the hallway outside of her apartment. She continued:

"I asked him to go home and forget about it; it didn't worth it. I told him he had a wife and two kids and it don't worth getting into trouble; he can get in more trouble in five minutes than he can get out of in the next fifty-five years.

\* \* \* \* \* \* \* \*

Q. What did he say then? A. He asked me if—he said I was right and if I would let him go back inside he would forget about it."

As to the same incident, Wilsie Greene testified that "Rosie took Parker in the hallway," and that when they returned a few minutes later "Rosie said to him, 'now, Parker, I don't want any more disturbances' \* \* \* Parker agreed that he wouldn't make any more disturbances."

Robert Liggon's testimony as to this incident also contradicts the defendant's version. It was that he heard a commotion and went into the living room; that it was "all over when I got there. Preston Morrell was standing there and Parker was standing there. \* \* \* I asked them what the hell was wrong with them." His testimony continues:

"Q. Then what happened? A. Nothing. Everybody was sitting and bothering nobody.

\* \* \* \* \* \* \* \*

Q. What did you do? A. Went back in the kitchen."

The defendant's version of this incident was in conflict in one or more particulars with each of the witnesses. Significantly, Liggon did not testify that he ever warned Parker that Morrell would cut his throat. The testimony of the Greene sisters tended to show that the defendant was

the aggressor or at least equally guilty of starting the fight, thus disputing the defendant's story that he was twice attacked by Morrell.

The defendant's statement and the other testimony for the State are also in conflict on another important point, *i. e.,* as to what happened when Parker approached the Ellerbee car carrying his loaded shotgun. In his statement the defendant said,

"* * * as I walked around the car Morrell saw the gun and Bob said 'Man are you crazy' I told him no that I did not want to hurt anyone.

When Morrell seen me with the gun he tried to break out of the car and Bob held him in the car and I backed away and then Bob ran up to me that left Morrell free and then Morrell started for me * * *."

In his version of the occurrence, Howard Brown testified that when Liggon saw Parker approach the car, Liggon "jumped out of the car and told him to put the gun down, and started pushing him back." Liggon's testimony as to this point was contradictory and is of little value in interpreting the event.

██ Some parts of the testimony of the State's witnesses supported portions of the defendant's statement. However, in view of the inconsistencies between the defendant's statement and the testimony of the witnesses for the State, it was clearly for the jury to determine whose version of the evidence was to be accepted. In the light of what has been said above, we conclude that the trial court did not commit error in failing to charge the jury that they were bound to accept as true the exculpatory portions of the defendant's statement unless disproved.

██ We have not set out the contradictions between the defendant's statement and his testimony on his own case, though they are many and material. We have not done so because we are satisfied that the above discussion sufficiently disposes of defendant's first contention, and also because the same discussion will also serve to dispose of defendant's

second argument. That argument is that the trial court erred in denying defendant's motion for acquittal at the end of the State's case because the State did not disprove the exculpatory portions of his statement and, therefore, that the "defense of self-defense appears by undisputed facts on the State's own case." It is clear from what has been said above that far from being undisputed the exculpatory portions of the defendant's statement were contradicted in many details by the witnesses for the State. It would have been improper for the trial court to assume the defendant's version of the facts, and to take the case from the jury. We therefore conclude that the motion for acquittal was properly denied.

In the above discussion, we have not considered the serious question whether, accepting as true the facts set forth in the defendant's statement, the defense of self-defense would be established. See *State v. Agnesi,* 92 *N. J. L.* 53 (*Sup. Ct.* 1918), affirmed *Id.* 638 (*E. & A.* 1919).

The defendant's third point is that "the trial court erred in giving instructions limiting the effect of the prior aggression by the deceased in the apartment." In its charge on self-defense the trial court said that in determining whether the necessity for using force actually existed or reasonably appeared to the defendant to exist, as well as the propriety of the force used, the jury should look to the "situation of the accused at the time [of the shooting], as revealed by all of the evidence." Later in his charge the trial court said:

"It would appear to the Court from the evidence that your primary concern here should be with the events which occurred after the defendant arrived at his home in determining whether in your judgment the defendant acted in self-defense. Of course, members of the jury, in your deliberations you will consider all of the evidence in the case, including the evidence of the events which took place at the apartment, in arriving at your verdict."

The defendant contends that these instructions had the improper tendency to divert the jury's attention from the events

occurring in the Greene apartment, and unduly emphasized what occurred thereafter.

██ We see no error in the above charge. It is entirely correct on the law. We approve, especially in a protracted trial, like the one under review, with its voluminous and conflicting testimony, of a trial court's undertaking to point out to the jury the significant evidence in the case. Of course, the trial court must, as it did here, leave the ultimate decisions of fact to the jury, and tell them that it is doing so. *State v. Overton*, 85 *N. J. L.* 287, at *p.* 294 (*E. & A.* 1913); *State v. Peterson*, 10 *N. J.* 155, at *p.* 162 (1952).

█ The defendant's fourth point is that the trial court erred in receiving evidence of the defendant's previous sentences for crime on his pleas of *non vult*. He does not attack the manner of proof of this evidence, or the purpose for which it was admitted, and to which it was limited, by the trial judge. His sole argument is that unlike a conviction after trial, or a plea of guilty, a prior sentence on a plea of *non vult* should not be admissible to attack credibility in subsequent unrelated criminal proceedings. The defendant's brief concedes that "in this State, from the beginning of this century, *non vult* pleas to indictments for crimes have been held admissible for the purpose of affecting the credibility of the indictee in a subsequent unconnected [criminal] case." *State v. Henson*, 66 *N. J. L.* 601 (*E. & A.* 1901); *Hill v. Maxwell*, 77 *N. J. L.* 766 (*E. & A.* 1909); *Kravis v. Hock*, 136 *N. J. L.* 161 (*E. & A.* 1947); *State v. Duelks*, 97 *N. J. L.* 43 (*Sup. Ct.* 1922). The defendant points out that this court has not had occasion to pass on this question, and seeks a re-examination of the long-recognized rule.

██ We believe that the cases cited above represent the proper approach to this issue, *i. e.,* that for the purpose of attacking credibility of a witness, his prior sentencing for crime on a plea of *non vult* or *nolo contendere* should be treated just like a conviction after trial or a plea of guilty. See *State v. Costa*, 11 *N. J.* 239 (1953). We there-

fore conclude that the trial court committed no error in this regard.

The defendant's fifth point is that the court erred in permitting the State to introduce photographs of Morrell's body. These photographs were not without relevance, and were not gruesome or horrifying. We see no way in which the defendant was prejudiced by them. Admission of such photographs is a matter committed to the discretion of the trial court, which we are satisfied in this case was not abused. *State v. Wise,* 19 *N. J.* 59 (1955).

The defendant's final argument is that the errors complained of, in the aggregate, deprived him of a fair trial. We have concluded that there is merit in none of the grounds specifically urged as error. We are also entirely satisfied, from a careful examination of the trial record, that the defendant received an eminently fair trial, and that his rights were scrupulously and competently guarded by the trial court.

The judgment of conviction is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For reversal*—None.