STATE OF NORTH CAROLINA v. HOWARD P. LINDSAY

No. 798SC797

(Filed 4 March 1980)

**Homicide § 21.9— husband's attempt to prevent wife's suicide—insufficient evidence of manslaughter**

> Defendant who was accused of shooting his wife was entitled to a dismissal of the charges against him where the evidence tended to show that defendant turned from the refrigerator to see his wife holding a gun; the wife said, "I've had it"; defendant walked toward his wife and attempted to prevent her suicide; and the gun went off when he had a partial hold on it.

APPEAL by defendant from *Barefoot, Judge.* Judgment entered 26 April 1979 in Superior Court, WAYNE County. Heard in the Court of Appeals 29 January 1980.

Defendant was indicted for second degree murder in the shooting death of his wife. He was found guilty of voluntary manslaughter and sentenced to 10-12 years. Defendant appeals.

*Attorney General Edmisten, by Associate Attorney Christopher P. Brewer, for the State.*

*Hulse and Hulse, by Herbert B. Hulse, for defendant appellant.*

ARNOLD, Judge.

Defendant contends that he was entitled to have his motions for dismissal granted. We need not consider whether defendant was entitled to dismissal of the charge of second degree murder, since the jury did not find him guilty of that crime. However, we do consider the merits of his contention with regard to the lesser offenses of voluntary and involuntary manslaughter.

A motion to dismiss and a motion for nonsuit are equivalent. See G.S. 15-173. Upon either motion, the test is whether the evidence, considered in the light most favorable to the State, is sufficient to show each essential element of the offense, and that defendant was the perpetrator. *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971). Having applied this test, we have determined that defendant was entitled to have the charges against him dismissed.

The evidence, in the light most favorable to the State, shows the following: On 28 November 1978, the police, responding to a call, found defendant's wife lying in a pool of blood on the floor of her home. A .38 caliber revolver was lying across the fingertips of her right hand. Defendant told the police at that time that his wife just had fixed a sandwich for him to take to work. He had been at the refrigerator getting some juice, and when he turned around his wife said, "I've had it." She had a gun in her right hand and the gun was cocked. Defendant started walking toward her, asking her to talk about it, and he was about one foot away from her when she shot herself.

Defendant stated that things bothered his wife at times, but that she was not sick at this time as far as he knew. She had been upset over his buying a sweater the night before, but they did not argue. He could not understand why she shot herself.

On December 1, defendant was questioned by the police. At that time, he told them that his wife had had bad headaches, dizziness and depression. At one time she had stated that she couldn't live with the headaches. On the day of her death, his wife had decided not to go to work, and he offered to stay home with her but she said it was not necessary. Defendant repeated to the police that when he turned from the refrigerator, his wife had a gun in her hand, and she said, "I've had it." He stated that he took hold of her arm and the gun fired. To specific questions, defendant gave the following answers: Q: "Did your wife shoot herself?" A: "I'm satisfied that my wife did not shoot herself." Q: "Did you shoot your wife?" A: "I could have. I partly had a hold of the gun. I was trying to get the gun away from her." Defendant and his wife had not argued on the day of her death.

The forensic pathologist who performed the autopsy on defendant's wife testified that she died from a gunshot wound to

the head. Powder found on the skin near the wound indicated that the gun was "not too far away" when it was fired. The wound was not like suicide wounds he had observed, because "[s]uicidal individuals, when they shoot themselves will place the gun in contact with or very close proximity . . . [to] the skin." But if the suicide were interrupted by two people struggling for the gun, he would not expect to see a typical suicide pattern.

Hand wipings taken from the deceased did not reveal significant concentrations of barium and antimony, but this did not eliminate the possibility that the deceased had fired the gun. No hand wipings were taken from defendant.

We find that this evidence fails to establish the essential elements of either voluntary or involuntary manslaughter. Voluntary manslaughter "occurs when one kills *intentionally* but does so in the heat of passion suddenly aroused by adequate provocation or in the exercise of self-defense where excessive force under the circumstances is employed or where the defendant is the aggressor bringing on the affray." *State v. Wilkerson*, 295 N.C. 559, 579, 247 S.E. 2d 905, 916 (1978) (emphasis added). The State has presented no evidence here that defendant intentionally shot his wife. The only evidence of his involvement in her shooting is defendant's statement that "I could have [shot her]. I partly had a hold of the gun. I was trying to get the gun away from her." This statement, in factual context, is consistent with an accidental firing of the gun, but not with an intentional firing.

Involuntary manslaughter is an unintentional killing without malice done by (1) an unlawful act not amounting to a felony or naturally dangerous to human life, or (2) a culpably negligent act or omission. *Id.* As we have said above, the evidence would not support a finding of an intentional act on defendant's part, so part (1) of the definition of involuntary manslaughter does not apply. Nor is there evidence that defendant was culpably negligent. Defendant's statement which implicates him in the shooting shows only that defendant, having heard his wife say "I've had it" as she stood with a gun in her hand, took hold of the gun to try to get it away from her. There is no evidence that the shooting resulted from reckless handling of the firearm. See *id.* (ordinarily an unintentional homicide resulting from the *reckless* use of firearms is involuntary manslaughter). Our holding that the State has

Chemical Co. v. Rivenbark

failed to establish involuntary manslaughter is consistent with the decision in *State v. Church*, 265 N.C. 534, 144 S.E. 2d 624 (1965) (per curiam), on similar facts.

Since we have determined that defendant was entitled to the dismissal of the charges against him, we need not address his assignments of error directed to the conduct of his trial. The judgment of the trial court is

Reversed.

Judges PARKER and WEBB concur.