STATE OF NORTH CAROLINA v. LANCE CRISP, SR.

No. 8330SC67

(Filed 18 October 1983)

**1. Homicide § 6.1— involuntary manslaughter defined**

  Involuntary manslaughter is the unintentional killing of a human being without either express or implied malice (1) by some unlawful act not amounting to a felony or naturally dangerous to human life, or (2) by an act or omission constituting culpable negligence.

**2. Homicide § 21.9— involuntary manslaughter—insufficient evidence—submission of issue as prejudicial error**

  Evidence in a second degree murder case that the gun discharged while defendant and decedent struggled for it and that defendant attempted to prevent decedent's suicide by grabbing the gun failed to show that defendant was reckless in his handling of the gun so as to support the trial court's submission of an issue of involuntary manslaughter to the jury, and the court's submission of the involuntary manslaughter issue was prejudicial error where the jury returned a verdict finding defendant guilty of involuntary manslaughter, and the evidence established a reasonable possibility that defendant would have been acquitted of all wrongdoing on the ground of accident had the issue of involuntary manslaughter not been submitted.

APPEAL by defendant from *Thornburg, Judge.* Judgment entered 20 August 1982 in Superior Court, SWAIN County. Heard in the Court of Appeals 29 September 1983.

Defendant was charged in a proper bill of indictment with first degree murder. The evidence introduced at trial tended to show the following:

On 19 April 1982 decedent Leonard Cable went to defendant's home where defendant lived with his seventeen-year-old girl friend and defendant's three-year-old son. Cable and Crisp, longtime friends, shared some "liquor" and then left together in Cable's van. They returned to the house at approximately ten o'clock that evening. Shortly after their return they took defendant's 30-30 rifle outside and twice fired the gun. After they came back into the house, defendant and Cable discussed plans for a joint trip to visit relatives in Charlotte. Defendant told Ms. Beck, his girl friend, to pack for the trip. Shortly after she began to do so, the rifle discharged, killing Leonard Cable. Police arriving at the scene found both defendant and Ms. Beck splattered with blood and Cable on the floor with a gunshot wound in

his head. The rifle was next to the body. The defendant made a statement to police at the scene, related by the officer at trial as follows:

> Mr. Crisp's exact words were that Leonard Cable picked the weapon up and told Mr. Crisp " 'I show you how you can end your God damn troubles,' and he put the gun to his head and blew his brains out." He also told me that he told Mr. Cable not to do it and he grabbed the weapon and it went off.

The State introduced expert testimony that the decedent's fingers had been injured in the course of the incident, and that this injury probably occurred because Cable's fingers were in front of the gun, rather than on the trigger, when it discharged.

The evidence other than that set out above was confused and confusing. The only surviving eyewitness to the incident, other than the defendant, was the seventeen-year-old girl friend, Tommie Elaine Beck. Ms. Beck testified at trial that she was under psychiatric care and was taking medication prescribed by a doctor at the Smoky Mountain Mental Health Center. She stated that this medication "makes me forget what happened on April the 19th and since I've been taking that medication I don't really remember what happened on April the 19th. I can just barely remember."

Ms. Beck testified as a witness for the State. On direct examination she first testified that she was packing her clothes when she heard the gun go off. She went on to say that the decedent had kissed her, provoking an angry response from defendant. She stated:

> Leonard had the gun when I turned my back and then Lance took it away from Leonard and then I was packing the clothes and I felt something hit me on the ear and heard a gun go off. I turned around and Lance said "Leonard has blowed his brains out."

Immediately after testifying to the above, Ms. Beck stated that defendant threatened her if she ever told the police what she "had seen," and that he placed the gun next to the body "so it would look like . . . suicide." On cross-examination Ms. Beck testified that "Lance and Leonard came in drunk and they were fighting over the gun and then the gun went off. . . ." She next

testified that while she was packing "Lance and Leonard were in the bedroom. . . . [T]hey were not arguing or having any kind of fight or anything like that. . . . I had my back to Leonard. I heard the gun go off but I hadn't heard Leonard Cable say anything before then." Ms. Beck's final account of the incident was as follows:

> After Leonard had been pointing the gun around, Lance took it away from him. I think they were fighting over it, but I'm not sure, but I think they were. Lance tried to take the gun away from Leonard and Leonard kept pulling the gun back from him and they kept pulling the gun from one another back and forth. They were not hitting each other and they were not arguing or squabbling over the weapon. In fact, I didn't ever hear them have any arguments that night. I don't remember what Lance did with the gun when he finally got it away from Leonard, I can't remember anything hardly anymore, because I am in no shape to be up here in the witness stand today. I have already had one nervous breakdown and the next one could put me away.

At the conclusion of her testimony, Ms. Beck stated: "What I have told here today is . . . half true." A Special Agent with the North Carolina Bureau of Investigation testified as to statements made to him by Ms. Beck, for the limited purpose of corroborating her testimony. He stated: "I have taken four separate statements from Ms. Beck and on two occasions she told me that Leonard Cable committed suicide, on one occasion she told me that Lance had the gun in his hand and Leonard grabbed it and it went off and on one occasion she told me that there was a scuffle over the gun and that it went off while it was in Leonard's hands."

The court submitted second degree murder, voluntary manslaughter, involuntary manslaughter, and not guilty as permissible verdicts. The jury found defendant guilty of involuntary manslaughter and from a judgment imposing a prison sentence of ten years defendant appealed.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Barry S. McNeill for the State.*

*McKeever, Edwards, Davis & Hays, by Fred H. Moody, Jr. for the defendant, appellant.*

HEDRICK, Judge.

Defendant contends the court erred to his prejudice in submitting to the jury the possible verdict of involuntary manslaughter. Resolution of this question requires a two-step analysis: (1) whether the evidence in the record will support a verdict of involuntary manslaughter, and (2) if not, whether erroneous submission of the possible verdict was prejudicial error.

[1]  Our Supreme Court had defined involuntary manslaughter as "the unintentional killing of a human being without either express or implied malice (1) by some unlawful act not amounting to a felony or naturally dangerous to human life, or (2) by an act or omission constituting culpable negligence." *State v. Wilkerson,* 295 N.C. 559, 579, 247 S.E. 2d 905, 916 (1978) (citations omitted). "The crux of [involuntary manslaughter] is whether an accused unintentionally killed his victim by a wanton, reckless, culpable use of a firearm or other deadly weapon." *State v. Wrenn,* 279 N.C. 676, 683, 185 S.E. 2d 129, 133 (1971).

[2]  The record in the instant case is devoid of any evidence that defendant shot Cable "by some unlawful act not amounting to a felony or naturally dangerous to human life." None of the witnesses, including Ms. Beck, identified any "unlawful act" allegedly committed by defendant which resulted in the unintentional killing of Leonard Cable. We turn, then, to the question whether the evidence shows "an act or omission constituting culpable negligence" on the part of defendant.

The law is clear that the fact that a shooting occurred does not, standing alone, demonstrate culpable negligence. *See State v. Church,* 265 N.C. 534, 144 S.E. 2d 624 (1965); *State v. Honeycutt,* 250 N.C. 229, 108 S.E. 2d 485 (1959). There must be some identifiable act or omission on the part of the defendant which was criminally negligent and which proximately caused the death of the victim. *State v. Everhart,* 291 N.C. 700, 231 S.E. 2d 604 (1977). We thus examine the evidence produced at trial, considered in the light most favorable to the State, to see whether the evidence establishes such an act or omission. The only evidence produced by the State in support of an unintentional killing is derived from one of the several versions of the incident testified to by Ms. Beck. She indicated that the defendant and the victim struggled for the gun, and the gun discharged. We note that this version is

consistent with defendant's statement to an officer at the scene that defendant attempted to prevent Cable's suicide by grabbing the gun. The question, then, resolves itself into whether a struggle for the gun under the circumstances here presented constitutes "wanton, reckless, culpable use of a firearm." We hold that it does not.

*State v. Lindsay,* 45 N.C. App. 514, 263 S.E. 2d 364 (1980) involved facts similar to those found here. In *Lindsay* there was evidence that the decedent had held a gun to her head, that defendant attempted to take the gun away, and that the gun discharged, fatally wounding the victim. On these facts this Court held that the trial court erred in submitting involuntary manslaughter as a possible verdict, saying that "[t]here is no evidence that the shooting resulted from reckless handling of the firearm." *Id.* at 516, 263 S.E. 2d at 366. Because the evidence in the present case, like that in *Lindsay,* fails to demonstrate that defendant was reckless in his handling of the gun, we hold that the trial court erred in submitting to the jury the possible verdict of involuntary manslaughter. We must thus consider the critical question whether the error was prejudicial to the defendant.

In deciding whether submission of involuntary manslaughter was prejudicial error under the facts here presented, we are guided by the words of our Supreme Court in *State v. Ray,* 299 N.C. 151, 167, 261 S.E. 2d 789, 799 (1980):

> Whether such an error is harmless depends . . . upon the facts and circumstances peculiar to each case. We hold simply that the facts and circumstances peculiar to the instant case warrant a conclusion that, absent the erroneous submission of involuntary manslaughter, there is a reasonable possibility that the jury would have returned a verdict of acquittal. The error complained of was therefore prejudicial to the defendant.

The evidence in *Ray* was uncontradicted in establishing an intentional killing, which the defendant alleged was committed in self-defense. *State v. Cason,* 51 N.C. App. 144, 275 S.E. 2d 221 (1981) also involved an intentional killing allegedly committed in self-defense. In each case, our appellate courts held that the evidence established a "reasonable possibility" that the defendant would

have been acquitted of all wrongdoing had not the judge erroneously submitted the verdict of involuntary manslaughter.

In the present case Ms. Beck's testimony about the struggle for the gun, coupled with the defendant's statement that Cable was shot when defendant tried to take the gun from him in an effort to prevent his suicide, raises a clear question whether Cable's death was the result of an accident. Because the record discloses a reasonable possibility that defendant could have been acquitted of voluntary manslaughter on the grounds of accident, the submission to the jury of involuntary manslaughter when there was no evidence to support it was prejudicial error.

Finally, we reiterate the admonitions implicit in Judge Webb's statements in *Cason.* Our trial judges in homicide cases arising out of the alleged intentional use of a deadly weapon would be well-advised not to submit involuntary manslaughter as a possible verdict where there is no evidence to support it. In addition to committing the prejudicial error already discussed, the trial judge who submits involuntary manslaughter under these circumstances makes his duty of declaring and explaining the law arising on the evidence impossible to fulfill; in such a case, the court's instructions can only result in "confusion worse confounded." The present case demonstrates such confusion. After declaring and explaining the law arising on the evidence with respect to second degree murder and voluntary manslaughter, the trial judge defined involuntary manslaughter and instructed the jury that

> If you find from the evidence . . . that on or about the 19th day of April, 1982, the Defendant Lance Crisp, Sr., intentionally pointed a loaded 30-30 rifle at Cable when not exercising his right of defense of his son, or otherwise grasped and waved and handled the rifle in a criminal—that is, the 30-30 rifle introduced into evidence as State's Exhibit 6, in a criminally negligent way thereby proximately causing Leonard Cable's death, then it would be your duty to return a verdict of guilty of involuntary manslaughter.

> However, if you do not so find or have a reasonable doubt as to one or more of these things, it would be your duty to return a verdict of not guilty. Or if you find that the deceased, Leonard Cable, died by accident or misadventure,

or that the State has failed to prove beyond a reasonable doubt that Defendant did not act in a proper defense of his son, your verdict must be not guilty.

The problem with the quoted instruction is that there is no evidence that the defendant "intentionally pointed a loaded 30-30 rifle" at Cable; even assuming that defendant did point the gun at Cable, there is not one scintilla of evidence that such act was the proximate cause of Cable's death. Furthermore, it is significant, we think, that the judge mentioned the defense of accident only in relation to the offense of involuntary manslaughter. Obviously, if the killing was accidental, the jury should have been instructed to find the defendant not guilty of any offense. Moreover, the court's instructions with respect to "defense of a family member" adds to the confusion. Assuming *arguendo* that there is some evidence from which the jury could find that the defendant intentionally shot Cable in defense of his son, the instruction is clearly misplaced in relation to involuntary manslaughter under the circumstances here presented, since the very definition of involuntary manslaughter embodies an unintentional killing.

Our concern is that when a possible verdict of involuntary manslaughter is erroneously submitted, the jury, rather than struggling with the confusing and contradictory instructions occasioned by the error, might resolve its dilemma by convicting of involuntary manslaughter and acquitting the defendant of murder or voluntary manslaughter, resulting in a manifest miscarriage of justice.

For the reasons set out herein, the judgment is reversed and the cause is remanded to the Superior Court for the entry of an order discharging the defendant.

Reversed and remanded.

Judges WEBB and HILL concur.