STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MIGUEL ANGEL CONCEPCION,
DEFENDANT–APPELLANT.

Argued May 3, 1988—Decided August 8, 1988.

*Michael Critchley* argued the cause for appellant (*Critchley & Roche*, attorneys, *Michael Critchley, Luanne M. Peterpaul*, and *Donald J. McCauley*, on the brief).

*Boris Moczula*, Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards*, Attorney General of New Jersey).

PER CURIAM.

Defendant, Miguel Concepcion, was convicted of reckless manslaughter, contrary to *N.J.S.A.* 2C:11–4(b)(1). He was sentenced to a five-year term, with a three-year parole ineligibility period pursuant to the Graves Act. *N.J.S.A.* 2C:43–6(c). The Appellate Division affirmed in an unpublished opinion. We granted certification, 109 *N.J.* 494 (1987), and we now reverse.

## I

The sequence of events leading up to the death of the victim in this case began on the morning of November 14, 1984, in defendant's living room. Defendant cleaned a gun that he legally possessed as part of his training to become a Newark Special Police Officer. After cleaning it, defendant practiced loading and unloading the gun. He put the loaded gun on a bookshelf to answer a telephone call, and subsequently left his apartment. Defendant returned to his apartment twice during the course of the day but did not touch the gun.

Later that evening, defendant and a friend, David Correa, were driving around the streets of Newark. At approximately 10:30 p.m., defendant and Correa picked up the victim, Jacqueline Jones, who was an acquaintance of Correa. Defendant had not met the victim prior to this encounter.

Defendant, Correa, and the victim then went to defendant's apartment. At some point, defendant's brother, Angel Concepcion, joined the group. Once inside the apartment, Angel went to the stereo in the living room and played some music, while Correa started dancing. Defendant toured the apartment with the victim for a few minutes and then returned to the living room, whereupon Correa entered the bathroom.

At trial, conflicting evidence was produced concerning what happened next. Defendant testified that when he came back into the living room with the victim, he saw the victim, out of the corner of his eye, pick up the gun from the bookshelf. Within seconds, according to defendant, he wrestled the gun away from the victim, and as he did, he realized that the gun was cocked. Defendant stated that as he attempted to uncock the gun, he saw the victim's hand coming towards him and he "just reacted and I lifted the gun, you know, like taking it away, just snatching it up * * *" and "the gun discharged."

After hearing the gunshot, Correa ran into the living room from the bathroom to see what happened. Defendant initially told Correa that the victim had shot herself. Defendant also

instructed Correa "never to tell anybody that Angel was there." When Correa called the Newark police to report the incident, he described the shooting as a suicide. Defendant told one of the officers who arrived on the scene that the victim had shot herself. Shortly thereafter, however, defendant recanted this version of the incident when he gave a statement to the police that comported with his testimony at trial. Defendant attributed his initial suicide account to his state of panic and nervousness immediately following the shooting.

Angel Concepcion fled the apartment as soon as he saw what had happened. The following morning he gave a statement to the police in which he stated that defendant "went to get his gun from one of the shelfs [sic] then the gun went off." However, at trial Angel testified that he had not actually seen defendant pick up the gun and had not seen any of the events leading up to the shooting because he was facing the stereo the entire time. Explaining the inconsistencies of his prior statement, he stated, "I was assuming because I was trying to figure it all together. I was just assuming that [defendant] had took [sic] the gun off the shelf but I never saw him pick the gun off the shelf myself."

## II

Defendant argues that the trial court erroneously instructed the jury on the single count of reckless manslaughter.[1] When evaluating the propriety of a jury charge, an appellate court "does not excise and examine in isolation those statements alleged to be obscure or ambiguous, but looks to the charge as a whole." *State v. Freeman*, 64 *N.J.* 66, 69 (1973); *accord State v. Ramseur*, 106 *N.J.* 123, 280 (1987).

---

[1]He also argues that his sentence must be vacated because the Graves Act cannot apply to the facts of this case. In view of our conclusion that the charge was inadequate, we do not reach the Graves Act issue.

In this case, the trial court began the charge by generally discussing the different responsibilities of the court, counsel, and jury in conducting a jury trial. The court then gave more specific instructions regarding the presumption of innocence and the concept of reasonable doubt. Within the reasonable doubt discussion, the trial court stated, "if, for example, the defendant's contention that the killing of Ms. Jones was accidental, if that causes such a doubt, it is your duty to give him the benefit of the doubt and acquit him."

In formulating the component of the charge dealing with reckless manslaughter, the trial court tracked the model jury charge and essentially consolidated three provisions of the Criminal Code. Under the Code "[c]riminal homicide constitutes manslaughter when * * * it is committed recklessly * * *." *N.J.S.A.* 2C:11–4(b)(1). "Recklessly" is defined by *N.J.S.A.* 2C:2–2(b)(3):

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Recklessness," "with recklessness" or equivalent terms have the same meaning.

Further, the Code provides that for a defendant recklessly to have caused a particular result, either the defendant must have been aware he or she risked such a result or the "result must involve the same kind of injury or harm as the probable result and must not be too * * * accidental in its occurrence * * *." *N.J.S.A.* 2C:2–3(c).

It is appropriate to repeat the entire text of the reckless manslaughter component of the charge:

Now, the defendant is charged in the indictment that on the 15th day of November, 1984 in the City of Newark, in the County of Essex aforesaid and within the jurisdiction of this Court he did recklessly kill Jacqueline Jones contrary to the provisions of N.J.S.A. 2C:11–4(b) and against the peace of this State, the government and dignity of the same. The defendant has pleaded not guilty to this indictment and thus raises the issue of facts to be ultimately

determined by you, namely whether the defendant committed the acts alleged by the State in the indictment.

A person is guilty of manslaughter if he recklessly causes the death of another human being. The State in such a case must prove beyond a reasonable doubt two factors: (1) That the defendant caused Jacqueline Jones' death and (2) that the defendant did so recklessly. With respect to the first element, in order to find the defendant caused Jacqueline Jones' death, you must find that she would not have died but for the defendant's conduct. With respect to the second element that the defendant did so recklessly in order to find that the defendant recklessly caused Jacqueline Jones' death, you must find that the defendant was aware of and consciously disregarded a substantial and unjustifiable risk that death would result from his conduct. The risk must be of such a nature and degree that considering the nature and purpose of the defendant's conduct and the circumstances known to him, his disregard of that risk is a gross deviation from the standard of conduct that a reasonable person would follow in the same situation. In other words, you must find that the defendant was aware of and consciously disregarded the risk or possibility of causing death. If you find that the defendant was aware of and disregarded the risk or possibility of causing death, you must determine whether that risk that he disregarded was substantial and unjustifiable. In doing so, you must consider the nature and the purpose of the defendant's conduct and the circumstances known to the defendant and you must determine whether in light of those factors, the defendant's disregard of that risk was a gross deviation from the conduct a reasonable person would have observed in the defendant's situation.

*In this regard, you should know that in and of itself, it is not illegal to keep a loaded gun in one's home. You will have to determine whether in light of all the circumstances, its presence in the defendant's home created or presented a substantial and unjustifiable risk which the defendant was aware of and consciously disregarded.* If you are not satisfied beyond a reasonable doubt that the defendant did both in fact cause the death of Jacqueline Jones and did act recklessly in causing that death, then you must find the defendant not guilty. In other words, if you find that the killing of Ms. Jones does not come within the definition of reckless manslaughter as I have instructed you, if you find that her killing was accidental, then the defendant must be acquitted.

On the other hand, if you are convinced beyond a reasonable doubt that the defendant, Miguel Concepcion, recklessly caused the death of Jacqueline Jones then you must find him guilty. [Emphasis supplied.]

The trial court concluded the charge by accurately instructing the jury on assessing the credibility of witnesses and weighing circumstantial and direct evidence.

After deliberating for three-and-one-half hours, the jury asked the court for clarification of the definition of recklessness. The court limited its recharge to a repetition of the statutory definition of manslaughter. The trial court did not

repeat its instruction relating to defendant leaving the gun on the bookshelf. After another hour-and-one-half of deliberations, the jury returned a verdict of guilty.

Accurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial. The trial court has an absolute duty to instruct the jury on the law governing the facts of the case. *State v. Butler*, 27 *N.J.* 560, 595 (1958). The charge must provide a "comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." *State v. Green*, 86 *N.J.* 281, 287–88 (1981); *see also Jurman v. Samuel Braen, Inc.*, 47 *N.J.* 586, 591–92 (1966) ("court's instructions must * * * plainly spell out how the jury should apply the legal principles to the facts * * *.").

Model jury charges are often helpful to trial courts performing this important function. However, it is not always enough simply to read the applicable provision of the Criminal Code, define the terminology, and set forth the elements of the crime. An instruction that is appropriate in one case may not be sufficient for another case. Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case. *See generally* Schwarzer, *Communicating with Juries: Problems and Remedies*, 69 *Cal.L.Rev.* 731, 741 (1981) (reviewing studies evaluating the efficacy of jury charges and recommending "against the use of abstract statements of legal principles and for the use of instructions phrased as concrete statements of the questions to be decided, incorporating the evidentiary context of persons, places, thing and events disclosed at trial.").

In this regard, it is "well settled in our State that the trial judge has the right, and oftentimes the duty, to review the testimony and comment upon it, so long as he clearly leaves to the jury * * * the ultimate determination of the facts and the rendering of a just and true verdict on the facts as it finds them." *State v. Laws*, 50 *N.J.* 159, 177 (1967), reargued, 51

*N.J.* 494, *cert.* denied, 393 *U.S.* 971, 89 *S.Ct.* 408, 21 *L.Ed.*2d 384 (1968). Incorporating specific evidentiary facts into a jury charge is especially helpful in a protracted trial with conflicting testimony. *State v. Parker*, 33 *N.J.* 79, 94 (1960).

In this case, it would have been helpful for the trial court to have explained to the jury that it had to make a preliminary finding concerning what occurred in defendant's living room on the night of the shooting. Then based on that finding, the jury should have been told to measure *all* of defendant's relevant conduct against the legal standard for reckless manslaughter. Therefore, the jury should have been instructed to evaluate the state of mind defendant possessed throughout the entire sequence of relevant events, which included leaving the gun on the bookcase, bringing a group of people into his apartment, allowing them into the living room although a loaded gun was there, and the manner in which he handled the gun, *i.e.*, the way he tried to wrestle it from the victim before the victim was shot.

The trial court was too selective in mentioning only defendant's conduct in leaving the loaded gun on the bookshelf. The jury heard extended testimony concerning the firearms training defendant had received in connection with his efforts to become a special police officer. This, in conjunction with the court's instruction that the jury had to determine "whether in light of all the circumstances, [the gun's] presence in defendant's home created or presented a substantial and unjustifiable risk which the defendant was aware of and consciously disregarded," incorrectly narrowed the focus of the jury's attention. The defendant's version of the facts, if believed by the jury, attributed the shooting to the unintentional discharge of the weapon as defendant wrestled the gun from the victim. Nevertheless, in attempting to explain its charge to the jury in the context of the testimony, the trial court omitted any mention of defendant's attempt to regain control of the weapon, restricting its explanatory comments to the reasonableness of defendant's

conduct in leaving a loaded gun accessible to others in his apartment. By selectively interpreting its charge to the jury in relation to one aspect only of the critical events, the trial court may have misled the jury and influenced it to return a guilty verdict based solely on that conduct.

Moreover, the jury's request for reinstruction suggests that some members of the jury did not understand sufficiently the concept of recklessness. Rather than repeating the abstract definition that left the jury uncertain in the first place, the trial court might have explained "recklessly" by comparing it with other mental states, such as purposely (*N.J.S.A.* 2C:2–2(b)(1), knowingly (*N.J.S.A.* 2C:2–2(b)(2), and negligently (*N.J.S.A.* 2C:2–2(b)(4). The jury's understanding of these distinctions could have been enhanced if these mental states had been clarified by illustrative examples. On balance, we are persuaded that the charge in the context of the evidence in this case was not sufficient.

Because the charge in this case inadequately guided the jury in performing the critical task of determining defendant's guilt or innocence, we reverse the conviction and remand the matter to the Law Division for a new trial.

HANDLER, J., concurring.

I agree with the majority's determination that the jury charge in this case was deficient, warranting a reversal. I write separately, however, to define more clearly the elements the State must establish in order to sustain a conviction for reckless manslaughter. I appreciate that although the issues presented in this appeal may not require such an exposition, it may prove instructive on the remand for retrial resulting from the Court's reversal of the conviction.

In enacting the current Code of Criminal Conduct, *N.J.S.A.* 2C:1–1 to 2C:98–4, the Legislature explicitly excluded a proposed negligent homicide provision, and instead limited criminal culpability for unintentional homicides to cases where the cause

of death was the defendant's reckless conduct. *N.J.S.A.* 2C:11–4(b)1. Under the Code, a person acts recklessly

when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. [*N.J.S.A.* 2C:2-2b(3).]

The requirement that a gross deviation from a reasonable person's standard of conduct be established, a standard that is also an element of criminal negligence, see *N.J.S.A.* 2C:2-2b(4), is an integral element of the Code's attempt to distinguish conduct that gives rise to criminal culpability, as opposed to merely civil liability. *See id.* It follows that unless there is sufficient evidence from which the jury could conclude beyond a reasonable doubt that defendant's conduct amounted to a gross deviation from the standard of conduct of a reasonable person, it would be improper to allow a jury to determine and return a guilty verdict for an offense that requires "recklessness."

The practice in our State implicitly recognizes that only a gross deviation from reasonable care amounts to recklessness. Thus, consistent with this understanding the practice generally has been to charge a jury on reckless manslaughter only when the evidence allows a finding that an accidental shooting was either the result of horseplay or the consequence of the defendant's unjustifiable decision to arm himself. In other words, the surrounding circumstances must indicate much more than ordinary carelessness or an accident that could not have been anticipated. For example, in *State v. Rovito*, 99 *N.J.* 581 (1985), it was proper to charge the jury on reckless manslaughter where the defendant was a police officer who invited some of the guests at a fraternity party to play Russian Roulette with his service revolver.[1] Similarly, the reckless manslaughter

---

[1] It is interesting to note that the defendant in *Rovito* was acquitted on the involuntary manslaughter charge, and was convicted only of unlawful disposition of a weapon. *N.J.S.A.* 2C:39-9d. *See Rovito, supra,* 99 *N.J.* at 583.

statute was properly applied in *State v. Reed,* 211 *N.J.Super.* 177 (App.Div.1986), sentence aff'd, 215 *N.J.Super.* 105 (App. Div.), certif. denied, 108 *N.J.* 667 (1987), where, as a prank, defendant pointed his shotgun at his girlfriend and pulled the trigger in the mistaken belief that the gun was unloaded. Finally, in *State v. Morales,* 111 *N.J.Super.* 521 (App.Div.1970), certif. denied, 57 *N.J.* 433 (1971), the court noted there was sufficient evidence from which a jury could have inferred criminal negligence, *i.e.,* recklessness, where one defendant produced a firearm with which a second defendant, assuming the weapon was a toy, fatally shot the victim. In all of these cases, there was evidence that defendant's conduct, either in pointing a firearm at a third person or inviting its use, posed a special danger, materially different in kind from merely handling a firearm that accidentally discharged.

In cases where a charge of manslaughter was based on a shooting that was the result of an alleged accidental discharge, as opposed to misuse of a gun believed to be unloaded, there were sufficiently egregious circumstances surrounding the defendant's possession or handling of a firearm that would permit a jury to infer that defendant's conduct created a substantial and unjustifiable risk that death or serious injury would result. In *State v. Curtis,* 195 *N.J.Super.* 354 (App.Div.), certif. denied, 99 *N.J.* 212 (1984), defendant was convicted of aggravated manslaughter for the accidental shooting of his friend's mother during an altercation between defendant, his friend, and his friend's stepfather in which all three principals were armed with rifles or shotguns. In *State v. Robinson,* 139 *N.J.Super.* 475 (App.Div.1976), although defendant was subsequently convicted of murder, the court found that there was sufficient evidence to charge the jury on manslaughter where defendant alleged that the victim was shot accidentally during a struggle after defendant attempted to display the weapon in order to intimidate the victim in a dispute over drug payments.

The experience of other states parallels that of New Jersey, with cases involving involuntary manslaughter falling into two

broad categories: horseplay and accidental shootings involving defendants who armed themselves for reasons other than legitimate self-defense. The horseplay cases provide tragic illustration of why some conduct with regard to the handling of firearms is so egregious as to require criminal sanction despite the fact that the defendant did not intend to harm the victim. For example, in *McMullen v. State*, 444 *So*.2d 1063 (Fla.App. 1984), defendant, after drinking at a party during which he had shot objects off his friend's heads at a range of five to six feet, accidentally shot and killed another person who challenged him to duplicate the feat at a range of thirty feet. Although defendant testified he believed the gun to be unloaded, the trial court found this to be irrelevant, and sustained the defendant's conviction for involuntary manslaughter, observing that

> [t]here is no question that the deliberate act of pointing a gun at another human being, especially one who is visibly intoxicated, amounts to an act in utter disregard for the safety of others, and one that appellant reasonably should have known was likely to cause death or great bodily injury. [*McMullen, supra*, 444 *So*.2d at 1064.]

Similar cases include *Marasa v. State*, 394 *So*.2d 544 (Fla.App.), review denied, 402 *So*.2d 613 (Fla.1981) (defendant, a guest at a "drug and alcohol" party, pointed a gun at another party guest in the mistaken belief that it was unloaded); *O'Berry v. State*, 348 *So*.2d 670 (Fla.App.1977) (victim, believing gun to be unloaded, gave it to defendant and instructed her to shoot him). Other cases finding evidence of horseplay with a firearm sufficient to establish reckless manslaughter include *People v. Zahner*, 77 *Ill.App*.3d 706, 33 *Ill.Dec.* 204, 396 *N.E*.2d 593 (1979) (one of two brothers involved in wrestling match over gun accidentally killed when other brother attempted to load gun); *State v. Foust*, 258 *N.C.* 453, 128 *S.E*.2d 889 (1963) (defendant and decedent, his girlfriend, were playing with his shotgun while he was visiting her); *State v. Wagner*, 50 *N.C.App.* 286, 273 *S.E*.2d 33 (1981) (defendant playing with a loaded shotgun).

In a similar fashion, the cases involving unjustified use of a firearm illustrate conduct that experience has shown leads to tragic consequences with sufficient frequency as to warrant

criminal sanction. As the court observed in *McBride v. State*, 191 *So.*2d 70, 71 (Fla.App.1966),

> by his act of becoming voluntarily intoxicated, in needlessly having on his person a deadly weapon which he brandished within the decedent's home in a careless and reckless manner, he set the stage for the tragedy which ultimately followed even though he may have had not [sic] intention of killing the decedent.

Other circumstances that have been found to amount to a sufficiently egregious deviation from a reasonable standard of care, thus permitting a jury to find criminal recklessness, include discharging a rifle in the general direction of a group of people in order to break up a fight, *People v. Fernetti*, 117 *Ill.App.*3d 44, 72 *Ill.Dec.* 537, 452 *N.E.*2d 790 (1983), rev'd on other grounds, 104 *Ill.*2d 19, 83 *Ill.Dec.* 375, 470 *N.E.*2d 501 (1984); drawing a loaded gun during a heated argument, *State v. Boyd*, 61 *N.C.App.* 238, 300 *S.E.*2d 578, *cert.* denied, 308 *N.C.* 545, 304 *S.E.*2d 238 (1983); carrying a shotgun during a drunken argument outside a bar, *Williams v. State*, 336 *So.*2d 1261 (Fla.App.1976); engaging in a drunken wrestling match over a loaded shotgun, *People v. Chew*, 45 *Ill.App.*3d 1024, 4 *Ill.Dec.* 481, 360 *N.E.*2d 417 (1977); or confronting a sister's ex-boyfriend with a loaded rifle, *People v. Harris*, 159 *Mich.App.* 401, 406 *N.W.*2d 307 (1987).

In his summation, the prosecutor in this case invited the jury to find that defendant could have been criminally reckless in merely inviting a third person into an apartment containing a loaded handgun or picking up such a handgun in the presence of a third person. It appears that the court's charge to the jury, which stated, in relevant part: "in and of itself, it is not illegal to keep a loaded gun in one's home. You will have to determine whether in light of all the circumstances, its *presence* in the defendant's home created a substantial and unjustifiable risk which the defendant was aware and consciously disregarded," (emphasis added), would have allowed the jury to convict on these facts alone. In my opinion, the mere coincidence of guests and a loaded gun in the same apartment does not amount to recklessness. While a person might be negligent

in leaving his gun in such a condition, absent extraordinary circumstances not present here, such as knowledge that small children will be present and have access to the gun, such conduct does not amount to the gross deviation from a reasonable standard of care required by *N.J.S.A.* 2C:2–2. Therefore, the measure of the adequacy of the State's proofs must be the evidence presented regarding defendant's conduct at the time of the shooting.

Focusing on the conduct of the defendant relevant to the actual shooting, the State must prove more than that defendant was handling the weapon at the time it accidentally discharged. Both our courts and courts of other states have limited the applicability of reckless manslaughter to cases in which there was evidence of horseplay or accidental shootings involving defendants who armed themselves for reasons other than legitimate self-defense. Side by side with such opinions, however, are a series of cases in which appellate courts have reversed convictions for involuntary manslaughter where there was no evidence that the firearm was intentionally discharged or that it was handled so recklessly as to constitute culpable negligence. It is unnecessary to describe the individual facts of these cases, since they all reach an identical conclusion: when the State can show only that defendant was holding a loaded firearm that accidentally discharged, resulting in the victim being shot, there is no rational basis for a finding of criminal culpability.[2] *See,*

---

[2]While the court in *People v. Moczarney,* 65 *Ill.App.*3d 410, 22 *Ill.Dec.* 224, 382 *N.E.*2d 544 (1978), indicated that merely drawing a loaded gun in the presence of others could constitute reckless conduct, it did so in the context of illustrating how reckless conduct could be established in the absence of evidence that defendant actually pointed the gun at the victim. The cases cited by the court all involved the handling of loaded weapons by intoxicated persons in crowded places. Furthermore, the record in *Moczarney,* which involved a fatal accidental shooting at a party in which defendant and the other guests were drinking heavily, playing Russian Roulette, and waving a loaded gun at each other, was replete with direct testimony of defendant's reckless acts. *See Moczarney,* 65 *Ill.App.*3d at 416–17, 22 *Ill.Dec.* at 228–29, 382 *N.E.*2d at 548–59. The comment by the *Moczarney* court must be read in its original context, and in no way

*e.g., Parker v. State,* 318 *So.*2d 502 (Fla.App.1975), *cert.* denied, 330 *So.*2d 21 (1976); *State v. Honeycutt,* 250 *N.C.* 229, 108 *S.E.*2d 485 (1959); *State v. Robinson,* 229 *N.C.* 647, 50 *S.E.*2d 740 (1948) (victim survived, court reversed defendant's conviction for assault with a deadly weapon); *State v. Holshouser,* 15 *N.C.App.* 469, 190 *S.E.*2d 420 (1972); *see also People v. Spani,* 46 *Ill.App.*3d 777, 5 *Ill.Dec.* 238, 361 *N.E.*2d 377 (Ill.App.1977) (weapon discharged as defendant placed it on a table; conviction for involuntary manslaughter overturned on the grounds of insufficient evidence).

I believe that under the law generally applicable in this case, the jury should have been instructed to find for the defendant if it believed his version of the events that occurred in the apartment on the night of the shooting. Defendant testified that the victim picked up the gun from the bookshelf and was shot when the gun discharged as defendant attempted to uncock the revolver after disarming her. In light of the tragic occurrences that frequently occur when people who are unfamiliar with firearms or who are unaware that the gun they are handling is loaded come into possession of such weapons, I cannot see how attempting to disarm such a person amounts to a gross deviation from the standard of care exercised by a reasonable person. *Cf. State v. Crisp,* 64 *N.C.App.* 493, 307 *S.E.*2d 776 (1983) (evidence showing that defendant was attempting to disarm the victim who had put gun to his own head found insufficient as a matter of law to sustain a conviction for involuntary manslaughter).

The State, however, argued a different version of the facts to the jury that, taken as true, would permit a jury to find that defendant's conduct amounted to a gross deviation from the standard of care exercised by a reasonable person. There was

supports the proposition that merely picking up a loaded handgun, without more, constitutes reckless conduct.

evidence, based on the pre-trial statement made to police by defendant's brother, that defendant picked up the gun,[3] and conflicting testimony from defendant himself on whether the gun had been stored in its holster or cocked at the time it discharged. From this, the jury could have inferred that defendant picked up the gun, removed it from the holster, and cocked it. The act of unholstering and actually cocking a loaded weapon in the presence of others, under circumstances in which there was no sound reason to ready the weapon for firing, could be considered by a jury to be criminally reckless behavior.

Therefore, the jury should have been instructed that if it found beyond a reasonable doubt that defendant, rather than the victim, had cocked the gun, thus increasing the likelihood of its being fired, *cf. State v. Griffin,* 273 *N.C.* 333, 159 *S.E.*2d 889 (1968) (finding that there was no evidence that accidental shooting was not the result of the defendant's own recklessness), it could find defendant guilty of reckless manslaughter.

With these additional observations, I concur in the result reached by the Court.

HANDLER, J., concurring in the result.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

---

[3]At trial, defendant's brother, who testified that he did not know who picked up the gun, explained the inconsistency of his statements on the grounds that he never actually saw what happened but assumed, in his discussion with the police, that since the gun was in defendant's hand after the shooting, defendant must have picked it up off the shelf.