**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2501-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RICHARD BUSBY, JR., a/k/a
RICHARD REED, GARY
BUSBY, RICHARD BIRD,
RICHARD JOHNSON,
RICHARD MORGAN, and
RICHARD REID,

     Defendant-Appellant.

_____

Submitted January 11, 2022 – Decided March 16, 2022

Before Judges Fisher and Currier.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 16-03-0454.

Joseph E. Krakora, Public Defender, attorney for appellant (Dillon J. McGuire, Designated Counsel, on the brief).

Lori Linskey, Acting Monmouth County Prosecutor, attorney for respondent (Carey J. Huff, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from his convictions, specifically contending the trial court erred by not tailoring the affirmative defense to felony murder jury charge to the evidence. Defendant also asserts the court erred in denying his motion for acquittal. We affirm.

I.

Defendant was charged in an indictment with: (1) second-degree conspiracy to commit armed robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1; (2) first-degree armed robbery, N.J.S.A. 2C:15-1; (3) second-degree aggravated arson, N.J.S.A. 2C:17-1(a); (4) first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); (5) first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3; (6) second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); (7) second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); and (8) second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1).

Following a trial in September 2018, defendant was convicted of first-degree armed robbery, first-degree felony murder, and first-degree attempted

2

A-2501-18

murder. He was acquitted of the weapons and arson charges. The State dismissed the conspiracy and certain persons counts.

According to the testimony presented by witnesses at trial, three co-defendants, Ellis Goodson, Jeffrey Mayhue, and Ranu Sinha, planned to break into a drug dealer's home to steal cash and marijuana. The original plan was for Goodson and Mayhue to break into the house. However, Goodson[1] testified he backed out on breaking into the home, but he agreed to drive and drop off the others at the house on the night of the robbery. Thereafter, Mayhue recruited defendant to participate in the robbery as Goodson's replacement.

Mayhue,[2] Goodson, and defendant met in Asbury Park on the evening of July 30, 2011. The three got into Goodson's car and drove to Sinha's house in Freehold. According to Goodson, only he and Mayhue went into the house to discuss the plans with Sinha for the robbery.

Goodson also testified that while he was driving with defendant and Mayhue, he saw a gun in Mayhue's book bag. At the time, Mayhue was in the front passenger seat and defendant was in the back seat. Goodson said Mayhue did not show him the gun and there was no verbal discussion about it.

---

[1] Goodson testified at trial pursuant to an agreement with the State.

[2] Mayhue pleaded guilty to one count each of felony murder and armed robbery.

On cross-examination, defense counsel questioned Goodson about an earlier statement he made to police. In that statement, Goodson told detectives he first saw the gun inside Sinha's house—outside defendant's presence. He said:

> [t]he night we [were] at . . . [Sinha's] house before I dropped [Mayhue and defendant] off [Mayhue] said he had a backup, the gun . . . . It was dull silver, black handle and tucked in his waistband. It had no holster.

On re-direct, Goodson testified that in his statement, although he said "[t]he night we [were] at . . . [Sinha's] house," he was referring to when Goodson, Mayhue, and defendant were in the car on the way to the deceased victim's home. Goodson testified Mayhue stated he had "backup," which Goodson understood to mean a gun, while Mayhue was taking the gun and zip ties out of a book bag.

According to Goodson, when he, Mayhue, and defendant arrived at the deceased victim's house, Goodson drove "a little bit down from the house" and dropped Mayhue and defendant off into a field. It was approximately 11:30 p.m. on July 30, 2011.

For the next several hours, Goodson drove past the house periodically to check if he could see anything but observed nothing. At approximately 5:00 a.m., Goodson answered Mayhue's phone, which was left in the car. It was Mayhue's girlfriend calling, asking where Mayhue was. Goodson continued to

4

drive "back and forth" until 7:00 a.m. on July 31, when he received a second call from Mayhue's girlfriend's phone. This time it was Mayhue himself. He said, "Something bad happened" and Goodson had "to meet [Mayhue] in Newark right away."

The deceased victim, identified as Michael Conway, and his girlfriend, Cheri Plamondon, shared a residence in Freehold. Plamondon testified at trial that Conway was involved in selling marijuana and kept it and other drugs in the home. She stated that in the early morning hours of July 31, 2011, she and Conway were sleeping when she felt "something being put to the back of [her] head and the person said don't look up, don't look up, and put your hands behind your back." Plamondon believed there was gun at her head. She stated she thought there were two intruders in the house because she heard two distinct male voices. The men then zip-tied her wrists and ankles.

As the intruders started to bind Conway with zip ties, they asked him "where the money was." Conway said there was no money in the house and offered to take the men to the bank. Plamondon then heard the intruders going through her and Conway's personal items and drawers. When the men asked Conway for his car keys, he told them the keys were in the kitchen. Plamondon

said Conway then "rolled over [her] on to the ground" and she heard "punching." She next heard a gunshot and Conway's screams.

During his trial testimony, Goodson also described the events in the house as relayed to him by Mayhue. He said Conway jumped on Mayhue's back and "started tussling with him." Mayhue had dropped his gun and he called to defendant to help him. However, Mayhue then picked up his gun and shot Conway. According to Goodson, Mayhue later said he watched Conway take his last breath. And Goodson stated, that because Mayhue thought he left some of his DNA on Conway during the struggle and subsequent shooting, Mayhue set the house on fire, while Plamondon was still inside.

Plamondon recalled that, after the gunshot, she heard one of the intruders say, "I got blood on me," and the intruders left the room. When the men came back in, Plamondon said they started "pouring stuff on the nightstand" and "by [Conway] on the floor" that "smelled like gas[oline]." The intruders stuck a rag in Plamondon's mouth, which she said also smelled like gasoline, and then lit something in the hall. When Plamondon started to smell smoke, she opened the

6

window, jumped out, and "ran through the woods to a neighbor's house."[3] The neighbors called the police.

The fire marshal testified regarding the investigation of the fire. He determined a flammable liquid was used to start the fire in the bedroom. As firefighters worked to suppress the fire, they discovered Conway's body on the floor. The fire marshal also testified there was a separate, second fire near a gas-powered generator in the garage.

Detectives testified about time-stamped video footage from July 31, 2011, at 2:25 a.m. It revealed a person crawling into view from the left near the detached garage. After the movement activated the motion sensor light, the person quickly exited to the right. The detective identified the person as Mayhue.

Another camera, located at the rear of the residence, captured a person crawling from the right toward the back deck of the house at 3:16 a.m. The detective testified this person was "[s]maller than . . . Mayhue and not stocky." The person was wearing a hat, boots, long pants, a long-sleeved shirt, and two-tone gardening gloves. The gardening gloves were the same style as those later

---

[3] The home surveillance videos depicted Plamondon escaping through the bedroom window on July 31, 2011 at 6:09 a.m.

A-2501-18

found in Conway's stolen car. The gloves had blood on them containing Conway's DNA, and a band-aid was found on the inside of one of the gloves containing defendant's DNA. A camera at the front of the house captured Conway's car driving away from the house at 6:11 a.m.

Lieutenant Donna Morgan of the Monmouth County Prosecutor's Office testified that the intruders entered through the basement window under the deck. She deduced this from the fact that the screen to the basement window had been removed and was found under the deck and there was dirt on the top of the basement refrigerator and on the basement floor near the open window.

During the course of the investigation, Plamondon provided an inventory of missing jewelry taken from the Freehold house. She included a photo of herself wearing a diamond ring on a necklace, alongside Conway, who was also wearing a necklace. Detectives obtained records from a pawn shop documenting Mayhue's sale of a ring and necklace matching those worn by Plamondon in the photo.[4] Other records obtained from a jewelry store in the same location, Fast

---

[4] The pawn shop was within walking distance from where defendant and Mayhue lived.

Cash Jewelers, documented defendant selling a bracelet on August 1, 2011.[5] Plamondon identified the bracelet as hers.

On August 3, 2011, the Elizabeth Police Department located and towed Conway's stolen car. A search pursuant to a warrant uncovered the previously discussed gardening glove as well as soil and a New Jersey Turnpike ticket time-stamped July 31, 2011, at 7:33 a.m. The jury also heard testimony regarding defendant's and co-defendants' cell phone records.

## II.

At the close of the State's case, defendant moved for acquittal on all charges under Rule 3:18-1.[6] In considering the armed robbery charge, the judge stated that if the jury believed Goodson's testimony, it

> could certainly reasonably conclude that [defendant] was involved in the armed robbery. The testimony, if I recall from . . . Goodson, was that he drove . . . Mayhue and [defendant] to the scene and saw them get out of the car, at which time they proceeded to the area of woods right outside the home in Freehold . . . .
>
> Goodson also testified that it was during the car ride driving . . . Mayhue and [defendant] to the scene[] that he first observed the weapon held by . . . Mayhue.

---

[5] Fast Cash Jewelers was two blocks away from defendant and Mayhue's residences.

[6] Because defendant was acquitted of some of the charges, we only address the charges on which he was convicted.

9

The testimony was that [defendant] was in the car also, and while perhaps there was no direct testimony to suggest that [defendant] leaned over the front seat to observe it . . . . However, the testimony does suggest that [defendant] did drive down from Newark with . . . Mayhue, that he was part of the plan. The plan had been discussed previously and I think there is certainly enough evidence to suggest that [defendant] knew that . . . Mayhue had a weapon on him when they went into the home.

As to the felony murder charge, the court found:

if the jury is to believe the testimony of . . . Goodson, as well as all the other circumstantial evidence linking [defendant] to the scene, the testimony from the surviving victim . . . that there were two individuals in the house, the testimony of . . . Goodson with regard[] to who he described as having dropped off at the scene, . . . the Band-Aid in the glove linking it to [defendant], the proceeds from the robbery having been pawned in the area near [defendant's] home would suggest that he was an active participant in the felony and also the felony murder.

Addressing the attempted murder charge, the judge stated:

the testimony . . . that . . . Plamondon was zip tied up and ordered face down, and while ordered face down she was instructed not to look up . . . while one person remained in the room, another individual went to the garage to get the gasoline, doused the bedroom with gasoline and the flame was struck. Certainly all within the parameters of the course of committing the robbery, certainly reasonably foreseeable that . . . would be an event that would occur in the commission of a felony.

10

Therefore, the judge concluded, giving all favorable inferences to the State, there was sufficient evidence for a jury to find defendant guilty of the charges.  The motion for acquittal was denied.

During the jury charge conference, defendant requested the court include the affirmative defense to felony murder.  Over the State's objection, the court agreed to do so and charged the jury with Model Jury Charge Felony Murder—Non-slayer Participant, N.J.S.A. 2C:11-3(a)(3).

### III.

On appeal, defendant raises the following points for our consideration:

> POINT I
>
> THE JURY CHARGE WAS FUNDAMENTALLY FLAWED. THE COURT'S INSTRUCTION ON THE AFFIRMATIVE DEFENSE TO FELONY MURDER WAS UNTETHE[RED] TO THE DEFENDANT'S FACTUAL CONTENTIONS, THEREBY DEPRIVING DEFENDANT OF A FAIR TRIAL.
>
> POINT II
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO DISMISS THE FELONY MURDER COUNT PURSUANT TO RULE 3:18-1.

A-2501-18

A.

Defendant contends the trial court failed to properly mold the model jury charge on the affirmative defense to felony murder with accurate references to the factual record. He asserts the instruction did not alert the jury that evidence in the record supported all four elements of the affirmative defense. Therefore, the instruction did not fully or adequately explain to the jury what its "responsibility was regarding its deliberations on the affirmative defense." Because defendant has raised this error for the first time on appeal, we review for plain error. State v. Walker, 203 N.J. 73, 89 (2010) (citing R. 2:10-2). When a court follows the Model Jury Charge, a reviewing court will generally not find plain error in the instruction. As long as model jury charges are "consistent with and modified to meet the facts adduced at trial, [they] should be followed and read in their entirety to the jury." State v. R.B., 183 N.J. 308, 325 (2005).

Appropriate and proper jury instructions "are essential for a fair trial." Washington v. Perez, 219 N.J. 338, 350-51 (2014) (quoting Velazquez v. Portadin, 163 N.J. 677, 688 (2000)). Our "review of a challenged jury instruction entails not only scrutiny of the charge itself, but an inquiry as to whether an erroneous charge may have affected the trial's result." Id. at 351. We will not reverse an error in jury instructions unless the error "produc[ed] an

unjust result or prejudice[ed] substantial rights." Ibid. (quoting Mandal v. Port Auth. of N.Y. & N.J., 430 N.J. Super. 287, 296 (2013)).

In tracking the Model Jury Charge, the court instructed the jury on the felony murder affirmative defense, stating:

> Under the statute which applies here, it is an affirmative defense to the charge of felony murder if there is proof in the case that [defendant] did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort ordinarily carried in public places by law abiding persons; and had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article or substance; and had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

> This means that the affirmative defense is not available to defendant unless there is evidence in the case supporting all of the four requirements and not merely one, or two or three of them. If there is such supporting evidence, then it is incumbent upon the State to negate this evidence by proof beyond a reasonable doubt. However, it is not necessary that all four requirements be negated. Since the defense is not available to defendant unless the evidence supports all four of the requirements, it is sufficient for the State in such case to present proof beyond a reasonable doubt negating any one of them.

13

If you find, after a consideration of all of the evidence that the State has proven to your satisfaction beyond a reasonable doubt each of the elements of the offense charged, as I have just explained them to you, that is, that [defendant] was engaged in the commission of or attempt to commit or flight after committing or attempting to commit the crime of robbery, as charged in the indictment. Two, that the death of . . . Conway was caused at some time within the course of the commission of that crime, including its aftermaths of flight and concealment efforts, then you must [find defendant] guilty of felony [murder].

On the other hand, if you find that the State has failed to prove to your satisfaction beyond a reasonable doubt any one or more of those elements of the crime charged, as I have explained them, then you must find [defendant] not guilty of felony murder. If you find there is evidence in the case supporting all elements of the affirmative defense which I explained to you, and that the State has failed to negate beyond a reasonable doubt, any one or more of them, then you must find the defendant not guilty of the felony murder. But if you find that the State has presented proof beyond a reasonable doubt negating one or more of those elements, and has also proven beyond a reasonable doubt all the elements of the offense charged, then you must find the defendant guilty of felony murder.

The Model Jury Charge incorporated the elements of N.J.S.A. 2C:11-3(a)(3)(a) to (d).

Defendant relies on State v. Concepcion in arguing the trial court did not properly tailor the instruction to the facts present here. 111 N.J. 373 (1988). In Concepcion, the Court found the defendant was entitled to a reversal of his

A-2501-18

conviction and remanded for a new trial because the trial court's jury instruction improperly highlighted the defendant's alleged criminal behavior and narrowed the jury's attention to the defendant's wrongful conduct. Id. at 380-81. Concepcion is readily distinguishable from the circumstances here.

In State v. Robinson, 165 N.J. 32 (2000), the Supreme Court explained when a more specific, fact-based jury charge is required. The Court stated, "that trial courts are free to add specific factual references to the . . . instruction when necessary for clarity or when the court concludes that such references are required in the interest of justice." Id. at 45 (citing State v. Parker, 33 N.J. 77, 93-94 (1960)). But trial courts are not required to summarize the strengths and weaknesses of evidence. Id. at 44-45. "[O]ur judicial system confers this responsibility upon defense counsel rather than the trial court." Id. at 45 (citation omitted). Counsel should summarize the strengths and weaknesses of the case, not the trial court. Ibid. Trial courts only need to refer to defendant's contentions in the jury instructions when the charge refers to the State's evidence in any significant way. Ibid. If the court refers to the State's evidence, then "it must also refer to the defendant's contrary contentions." Ibid.

The trial court's jury instruction here was a straight-forward and nearly verbatim recitation of the statutory requirements for the affirmative defense to

felony murder. The judge did not refer to the State's evidence in any significant way, and he did not give a one-sided instruction. Unlike Concepcion, the jury instruction did not inappropriately highlight defendant's wrongful conduct. To the contrary, the court instructed the jury that if "the State has failed to prove to your satisfaction beyond a reasonable doubt any one or more of those elements of the crime charged, as I have explained them, then you must find [defendant] not guilty of felony murder."

Defendant contends that because the court referred to the State's evidence, specifically defendant's "presence" at the crime scene as a "circumstance to be considered with the other evidence," it therefore should have included defendant's contrary assertions. However, the court did not make that statement when charging the affirmative defense. The references to defendant's "presence" were in the jury instructions for robbery and accomplice liability.

In its instruction on the affirmative defense to felony murder, the court did not refer to the State's evidence. Therefore, the court was not required to highlight defendant's evidence.

Defendant also asserts the jury instruction should have discussed and focused on the potential inconsistences in Goodson's testimony. However, as the Court stated in Robinson, our judicial system "confers this responsibility

16

upon defense counsel rather than the trial court." 165 N.J. at 45 (citation omitted). It is up to counsel to summarize the strengths and weaknesses of their case, not the trial court. Ibid. Defense counsel was free to bring out those inconsistencies, which he did, during the cross-examination of Goodson and in the closing arguments.

B.

We need only briefly address defendant's argument of error in the court's denial of his motion for acquittal. Under Rule 3:18-1:

> [a]t the close of the State's case or after the evidence of all parties has been closed, the court shall, on defendant's motion or its own initiative, order the entry of a judgment of acquittal of one or more offenses charged in the indictment or accusation if the evidence is insufficient to warrant a conviction.

A trial court considers "the evidence in its entirety," including the evidence presented by defendant. State v. Lodzinski, 246 N.J. 331, 340 (2021) (Patterson, J., concurring) (citing State v. Williams, 218 N.J. 576, 594 (2014)). Then, affording the State the benefit of all favorable testimony and inferences that could be drawn from the testimony, the trial court must determine whether a reasonable jury could find defendant guilty beyond a reasonable doubt. Ibid. In this context, a reasonable jury may draw an inference from a fact whenever it is "more probable than not that the inference is true" and does not need to find

17

the inference true beyond a reasonable doubt. Id. at 358 (citing State v. Brown, 80 N.J. 587, 592 (1979)). The State's case does not fail merely because the circumstances or evidence permit "some other rational explanation of defendant's conduct or fail to exclude every other conceivable hypothesis except guilt." Ibid. (citation omitted). In determining "whether a judgment of acquittal is warranted, the [trial] court 'is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State.'" State v. Zembreski, 445 N.J. Super. 412, 431 (App. Div. 2016) (quoting State v. Kluber, 130 N.J. Super. 336, 342 (App. Div. 1974)).

Here, the court considered all the presented evidence and, giving all favorable inferences to the State, properly denied the motion for acquittal. We see no reason to disturb that determination.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2501-18